**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| SADDIQ ABDUL-BAAQIY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-450 (RMC) |
| | ) | |
| FEDERAL NATIONAL MORTGAGE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

_____ )

**OPINION**

Plaintiff Saddiq Abdul-Baaqiy filed this class action lawsuit against Federal

National Mortgage Association alleging that (1) he was subjected to a pattern and practice of

race discrimination through disparate treatment and (2) he is representative of a class that was

subjected to personnel policies and practices that have a disparate impact on African Americans.

He asserts race discrimination claims under 42 U.S.C. § 1981 and the D.C. Human Rights Act,

D.C. Code §§ 2-1401 *et seq*.  Federal National Mortgage Association moves (1) to dismiss the

D.C. Code claim for lack of subject matter jurisdiction because the alleged discrimination

occurred in Virginia and not in the District of Columbia; (2) for summary judgment on all claims

based on the practice of "forced ranking"; and (3) to strike the class action allegations.  As

explained below, the motion will be granted in part and denied in part.

**I. FACTS**

The Federal National Mortgage Association (Fannie Mae) is a Government

Sponsored Enterprise headquartered in Washington, D.C.  Fannie Mae employed Plaintiff Saddiq

Abdul-Baaqiy, an African American, from 1996 through 1999 and from 2001 through 2011.  Mr.

Abdul-Baaqiy worked in Fannie Mae's D.C. office in 1996 through 1999 and again when he

1

resumed employment in 2001.  Fannie Mae transferred him to its office in Virginia in September 2004.  Opp'n [Dkt. 24], Ex. P (Pl. Decl.) ¶ 2.  In this latter position, Mr. Abdul-Baaqiy was a software developer with the title "Application Developer Analyst II."

In December 2008, Fannie Mae implemented a new performance review policy that imposed a quota for the number of high performance reviews that managers could award in each department, allegedly resulting in poor reviews for employees who actually met performance objectives.  Am. Compl. [Dkt. 13] ¶¶ 2, 6.  This "forced ranking" policy required that managers evaluate employees "relative to their peers," so that only 5% percent of employees would receive a "Significantly Exceeds Expectations" rating, 25% percent would receive a "Fully Meets Plus" rating, 50% would receive a "Fully Meets" rating, and 20% would receive an unsatisfactory rating of "Fully Meets Minus/Significant Issues" or lower.  Mot. to Dismiss and for Partial Summ. J. [Dkt. 20] (MTD/Partial MSJ), Ex. 3 (2008 Ratings Distribution) & Ex. 4 (FAQs on 2008 Ratings Distribution).

On September 10, 2009, Fannie Mae CEO Mike Williams sent a message to employees announcing a different performance evaluation policy.  *Id.*, Ex. 5 (Williams Letter). Mr. Williams noted that "a number of employees and managers have raised important concerns about the performance review process, especially the guidance that 20 percent of employees should fall into the bottom two rating categories."  *Id.*  The modified 2009 policy changed the percentages of employees for each performance level, directing that 5-10% receive a "Significantly Exceeds Expectations" rating, 15-25% percent receive an "Exceeds Expectations" rating, 55-75% receive a "Meets Expectations" rating, and 5-10% receive ratings of "Does Not Meet Expectations."  *Id.*

Under the 2009 policy, managers were required to evaluate employees by using a four step process consisting of divisional planning, pre-calibration preparation, calibration, and post-calibration.  Opp'n [Dkt. 24], Ex. C (Calibration Overview).  Calibration sessions are management fora led by Fannie Mae leaders (or the most senior level manager) for the purpose of assisting managers in evaluating the relative performance of employees before finalizing a rating.  *Id.*  Prior to a calibration session, managers were instructed to prepare draft assessments and initial ratings.  *Id.*, Ex. D (Session Leaders Preparation Guide).  Managers were instructed to articulate how each employee was performing as compared to their peers, even when the employee had met or was on course to meet all goals.  *Id.*, Ex. I (Year-End Process: FAQs).

Mr. Abdul-Baaqiy received satisfactory performance reviews throughout 2008. He contends that he was affected by the "forced ranking" policy when he received poor evaluations starting in mid-2009 until he was terminated for supposed performance deficiencies in April 2011.  Specifically, Steven Gonsalves, a Caucasian man, began supervising Mr. Abdul-Baaqiy in April 2009.  After three months, Mr. Gonsalves gave Mr. Abdul-Baaqiy an "off track" mid-year performance rating, but did not provide any comments to support or justify the "off track" rating.  *Id.*, Ex. A (2009 Mid-Year Review).  An email chain indicates that Plaintiff may have been rated as "off track" due to the division manager's need to meet distribution targets. *See id.*, Ex. L (June/July 2009 Email Chain).  A Fannie Mae employee by the name of Les Zimmerman[1] sent an email to Plaintiff's second line supervisor, Malcom Blundell, on June 29,

---

[1] The record does not indicate Mr. Zimmerman's title or role at Fannie Mae, but the June/July 2009 Email Chain implies he was a manager who, like Mr. Gonsalves, reported to Malcom Blundell, Plaintiff's second line supervisor.

2009 with the subject line "IR2[2] Mid-Year Performance Rankings—20% Off Track."  Mr.

Gonsalves, among others, was copied on the email.  Mr. Zimmerman stated:

> As you would expect, not everyone on this list [of 6 employees] is
> [identified] because of their performance against goals.  Several
> made this list as a result of the requirement to have 20%.  So, they
> ended up ranking below their IR2 [project] peers. . . . We discussed
> that the IR2 staff is among the best in Fannie Mae, working on a
> critical and extremely challenging project with the highest visibility.

The next day, Mr. Blundell responded, "Ron[3] directed me to rank you as a group and pick a

bottom 20%.  This I will do.  I must say that you are a high performing team, and all of you are

meeting my expectations at this point."  *Id.*  A few days later, on July 6, 2009, Mr. Blundell

directed that the six employees on Mr. Zimmerman's list, including Mr. Abdul-Baaqiy, "are to

be rated off track."  Later that day, Mr. Gonsalves responded, "done."  *Id.*

 For the 2009 year-end evaluation, Mr. Gonsalves prepared a draft performance

review, indicating that Mr. Abdul-Baaqiy had completed every goal and noting that he timely

completed assignments, was a "go-to" person for support, was an "advocate if not a champion"

of standards compliance, and that he just needed to "soften" his approach in advocating

compliance.  *Id.*, Ex. M (2009 Year End Review).  Mr. Gonsalves also noted that in the early part

of 2009, Mr. Abdul-Baaqiy attempted to take on responsibilities that exceeded his abilities, that

after mid-year coaching he took on assignments more in line with his skills, although there were

still some issues with quality and communication.  *Id.*  After Mr. Gonsalves met with Division

Director Joe Jucha, he downgraded the performance review, changing the evaluation of three

goals from "completed" to "off course."  *Id.*, Ex. O (Gonsalves Dep.).  In his final 2009 year-end

---

[2] "IR2" stands for Investor Reporting 2, the name of a project on which Plaintiff worked while he
reported to Mr. Gonsalves.  *See* Opp'n, Ex. S (Roy Dep.) at 41.

[3] The record does not indicate "Ron's" last name, title, or rank at Fannie Mae.

performance review, Mr. Gonsalves rated Mr. Abdul-Baaqiy as "Does Not Meet Expectations." *Id.*, Ex. N (2009 Year End Review).  In contrast with this rating, in a 2009 Accountability Survey Plaintiff's peers rated him at 4.28 and his managers rated him at 4.30 on a scale from a low of 1 to a high of 6.  *Id.*, Ex. V (2009 Accountability Survey).

In 2010, Sabari Roy, an Asian woman, was assigned to supervise Mr. Abdul-Baaqiy.  She issued Plaintiff an "off track" mid-year review at the end of July 2010.  *See id.*, Ex. S (Roy Dep.), Ex. 3 (2010 Mid-Year Review).  At the end of 2010, Ms. Roy gave Mr. Abdul-Baaqiy a "Does Not Meet Expectations" rating.  Roy Dep., Ex. 4 (2010 Year End Review).  On January 25, 2011, Mr. Abdul-Baaqiy received a memorandum of concern.  Roy Dep., Ex. 5 (2011 Mem. of Concern).  Fannie Mae fired Mr. Abdul-Baaqiy in April 2011.

On March 13, 2012, Mr. Abdul-Baaqiy filed a complaint alleging discrimination in D.C. Superior Court.  *See Abdul-Baaqiy v. Fed. Nat'l Mort. Ass'n*, No. 2012 CA 002386 (D.C. Sup. Ct. 2012).  The case was dismissed because he was required by Fannie Mae's Dispute Resolution Policy to arbitrate before proceeding to court.  Under the Dispute Resolution Policy, arbitration is binding on Fannie Mae but not on the employee.  MTD/Partial MSJ, Lam Decl. [Dkt. 20-14], Ex. A (Dispute Resolution Policy).  Mr. Abdul-Baaqiy proceeded to arbitration, the parties conducted limited discovery, and the arbitrator held an evidentiary hearing.  Lam Decl., Ex. D (Gonsalves Dep.), Ex. E (Hearing Transcript), Ex. F. (Roy Dep.), Ex. K (Abdul-Baaqiy Dep.).  The arbitrator determined that the Dispute Resolution Policy was an enforceable contract that required Mr. Abdul-Baaqiy to arbitrate, *see id.*, Ex. B (Order Compelling Arbitration) and he entered an award in favor of Fannie Mae, *see id.*, Ex. C. (Award).  Plaintiff rejected the Award. *Id.*, Ex. G (Notice of Rejection of Arbitration Award).

Subsequently, Mr. Abdul-Baaqiy filed this suit against Fannie Mae, alleging:

> Count I—race discrimination in violation of the Civil Rights Act of
> 1866, 42 U.S.C. § 1981; and
>
> Count II—race discrimination in violation of the D.C. Human
> Rights Act, D.C. Code §§ 2-1401 *et seq*. (DCHRA).

Am. Compl. [Dkt. 13].  Mr. Abdul-Baaqiy attempts to assert these claims on behalf of himself and "all African American employees, who were subject to Fannie Mae's forced ranking policies and practices which resulted in adverse personnel actions in lowered performance appraisals, discipline, including memorandum of direction and performance improvement plans, and termination from employment 2008 through 2011 based on their performance rating."  Am. Compl. ¶ 24.  The Complaint alleges that the forced ranking policy had a disparate impact on African Americans, in violation of both § 1981 and DCHRA:

> This policy and practice had a disparate impact on African American
> employees because managers were forced to issue lower
> performance appraisals to a certain number of employees regardless
> of their performance. Fannie Mae's "forced ranking" policy and
> practice since 2008 has led to a disproportionate number of African
> American employees receiving discriminatory performance
> appraisals which led to loss of compensation and termination from
> employment under false assertions of poor performance.   In
> addition, since 2008 Fannie Mae has carried out several mass
> displacements which have resulted in approximately 1000
> employees being terminated, and has utilized the false and
> discriminatory performance appraisals to justify the termination of
> certain employees.

*Id*. ¶ 2; *see also id*. ¶ 27.

No discovery has been conducted in this case.  The evidence cited above was part of the limited discovery conducted prior to arbitration.  Fannie Mae moves to dismiss the DCHRA claim for lack of jurisdiction, for summary judgment on all claims based on the practice of "forced ranking," and to strike the class action allegations.  MTD/Partial MSJ [Dkt. 20]; Reply [Dkt. 25].  Plaintiff opposes.  Opp'n [Dkt. 24].

### III. LEGAL STANDARDS AND ANALYSIS

**A. Motion to Dismiss D.C. Human Rights Act Claim**

        Fannie Mae moves to dismiss Plaintiff's DCHRA claim for lack of jurisdiction, asserting that the alleged discrimination occurred outside of the District of Columbia.  Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory requirement and an Article III requirement.  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  When reviewing a Rule 12(b)(1) motion, a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).  A court may consider materials outside the pleadings to determine its jurisdiction.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

        Fannie Mae contends that the Court lacks subject matter jurisdiction under DCHRA because the alleged discrimination occurred in Virginia and not in the District of Columbia.  The intent of the DCHRA is "to secure an end *in the District of Columbia* to discrimination for any reason other than that of individual merit . . . ."  D.C. Code § 2-1401.01

(emphasis added).[4]  To establish subject matter jurisdiction under DCHRA, a plaintiff who was

not employed in the District of Columbia must show that the alleged discriminatory decision was

made, its effects were felt, or both occurred in the District.  *Monteilh v. AFSCME, AFL-CIO*, 982

A.2d 301, 305 (D.C. 2009); *see also Cole v. Boeing Co*., 845 F. Supp. 2d 277, 285 (D.D.C. 2012)

(because discriminatory acts occurred in Virginia and discriminatory effects were felt there, the

federal district court in the District of Columbia lacked jurisdiction to adjudicate plaintiff's

DCHRA claim).  To show jurisdiction it is not enough to demonstrate that the employer was

headquartered in the District of Columbia.  *Id*. at 304-05.  *See Quarles v. Gen. Inv. & Dev. Co.*,

260 F. Supp. 2d 1, 20 (D.D.C. 2003) ("[T]he most important factor in determining whether a

court has subject matter jurisdiction over a [DCHRA] claim is not whether the plaintiff was

actually employed in the District of Columbia, but whether the alleged discriminatory acts

occurred in the District.").

          Plaintiff alleges that he suffered from adverse performance ratings starting in

2009, and that his poor reviews were the result of the "forced ranking" policy.  In 2009, Mr.

Abdul-Baaqiy was employed at Fannie Mae's office in Virginia.  Opp'n, Ex. P (Pl. Decl.) ¶ 2 ("I

was transferred to Virginia in 2004.").  Plaintiff insists that he was a D.C. employee, but this

insistence is belied by his Declaration, which asserts that "[b]etween 2004 to 2011, I worked

primarily in Virginia, but I attended work meetings in the District of Columbia."  *Id*. ¶ 4.  Mr.

Abdul-Baaqiy describes his work in 2009 more specifically:  "In 2009, I was assigned to work

on the Home Affordable Modification Program (HAMP) project, which was based in the District

---

[4] As does the District of Columbia, Virginia has a human rights act to prevent discrimination
within the Commonwealth.  *See* Va. Code Ann. § 2.2-3900 ("It is the policy of the
Commonwealth to . . . [s]afeguard all individuals within the Commonwealth from unlawful
discrimination . . . .").

of Columbia related to the HAMP project and prepared reports to support vendors working on the HAMP project in the District." *Id.* ¶ 5. Because Mr. Abdul-Baaqiy was located in the Virginia office and he worked primarily there, he was not a District of Columbia employee. The fact that he attended some meetings in the District of Columbia, prepared reports to support vendors who worked for Fannie Mae in the District of Columbia, and that he worked on the HAMP project did not make him a D.C. employee. Further, because Mr. Abdul-Baaqiy worked primarily in Virginia, the effects of the alleged discrimination were felt in Virginia.

Nonetheless, this Court has jurisdiction over the DCHRA claim because the alleged discriminatory acts that are the basis of the claim took place in the District. Fannie Mae's allegedly discriminatory "forced ranking" policy was instituted by its D.C. headquarters in 2008. Fannie Mae argues that (1) Plaintiff's claim of discrimination is based on his termination in April 2011, arising from poor performance reviews from July 2009 to January 2011;[5] (2) starting in 2009, the forced ranking policy was no longer mandatory; (3) if Virginia supervisors evaluated Plaintiff pursuant to a "forced ranking" policy, they did so *against* headquarters' policy; and (4) actions by managers in Virginia are not discriminatory actions that occurred in the District of Columbia and thus cannot serve as the basis of a DCHRA claim. In other words, the claim that Virginia supervisors applied "forced ranking" when it was no longer mandatory does not give rise to a DCHRA claim because the alleged discriminatory actions—evaluations and firing based on "forced ranking"—were taken in Virginia and not in the District of Columbia.

---

[5] As discussed below, Plaintiff has conceded that the statute of limitations bars DCHRA claims based on performance reviews before March 2011.

The evidence concerning whether the policy was mandatory from 2009 forward is equivocal.  CEO Williams' 2009 letter stated that the distribution percentages were "guidance and not mandate" but "if a division believes it cannot reach this distribution . . . then the division head will be afforded the opportunity to present and justify the proposed results to me and other [Executive Committee] members."  Opp'n, Ex. 5 (Williams Letter).  A further 2009 Fannie Mae policy guidance document indicated that "distribution targets are mandatory at the division level," and are "not mandatory for groups or units within a division."  *Id.*, Ex. F (Calibration Session Leader's Agenda).  Another 2009 guidance document expressly required managers to "adhere to the agreed upon ratings distribution."  *Id.*, Ex. E (Gathering Performance Feedback and Developing Ratings).

Even if the "forced ranking" policy was not mandatory for Plaintiff's immediate supervisors, it is clear that in 2009 Fannie Mae headquarters enforced the policy by requiring managers to undergo the calibration process and by requiring division managers whose ratings did not fall within the percentage distributions to meet with senior management officials to justify their rankings.

Fannie Mae also argues that Mr. Abdul-Baaqiy was not actually affected by the forced ranking policy.  Mr. Abdul-Baaqiy disagrees: Mr. Blundell directed Mr. Gonsalves to rank Plaintiff in the bottom 20% for the mid-year 2009 review, despite knowing that all of the employees on the IR2 Project (including Plaintiff) were among the best at Fannie Mae and that some employees were put in the lowest 20% even though they met their employment goals.  Ex. L (June/July 2009 Email Chain).  This bottom 20% ranking occurred in the same year that Mr. Abdul-Baaqiy's peers rated him at 4.28 and his managers rated him at 4.30, toward the high end of a 1 to 6 scale.  *Id.*, Ex. V (2009 Accountability Survey).

Plaintiff's DCHRA claim is based on the contention that supervisors rated him poorly and eventually fired him due to a "forced ranking" policy instituted and enforced by Fannie Mae headquarters, located in the District of Columbia.  The Court has subject matter jurisdiction over this claim.

### B. Motion for Summary Judgment on All Adverse Actions Other than Termination

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252. The nonmoving party must point out specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

Fannie Mae moves for summary judgment on all claims arising from the "forced ranking" policy, arguing that Plaintiff was not affected by the policy and that all claims based on performance reviews are time-barred.

### 1. Whether Plaintiff was Affected by "Forced Ranking" Policy

Fannie Mae contends that Mr. Abdul-Baaqiy was not actually affected by the forced ranking policy and cannot base his claims on the policy. As the Court already found, there is some evidence that Mr. Blundell directed Mr. Gonsalves to rank Plaintiff in the bottom 20% for his mid-year 2009 review—even though the IR2 staff such as Plaintiff was "among the best [at] Fannie Mae." Opp'n, Ex. L (June/July 2009 Email Chain). Mr. Gonsalves rated Mr. Abdul-Baaqiy as "Does Not Meet Expectations" at the end of 2009, *see id*., Ex. N (2009 Year End Review), despite the fact that Plaintiff's peers gave him a score of 4.28 and his managers gave him a score of 4.30, toward the high end of a 1 to 6 scale. *Id*., Ex. V (2009 Accountability Survey). Fannie Mae contends that summary judgment should be entered because Plaintiff misrepresents the Accountability Survey and that a score of 4 should be viewed as "at the low end" of the scale. Lam Decl., Ex. E (Tr. Sept. 3, 2014) at 83-84 (Gonsalves testimony). Fannie Mae's argument serves only to further illustrate that there is a genuine issue of material fact regarding whether Plaintiff was ranked poorly due to the "forced ranking" policy,[6] and summary judgment will not be entered on this ground.

### 2. Statute of Limitations

The statute of limitations for DCHRA claims is one year, starting from the date a plaintiff discovered or reasonably should have discovered the discriminatory act. D.C. Code § 2-

---

[6] The Court does not decide whether the "forced ranking" policy was in fact applied to Mr. Abdul-Baaqiy, whether the policy was racially discriminatory, or whether it caused his termination.

1403.16; *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 891 (D.C. Cir. 2003).  Mr. Abdul-Baaqiy originally filed suit in D.C. Superior Court on March 13, 2012.  Thus, all DCHRA claims that Plaintiff discovered or reasonably should have discovered before March 13, 2011 are time-barred.  In other words, any remedy for Mr. Abdul-Baaqiy's claims based on allegedly discriminatory performance reviews is untimely and precluded, but his claim for discriminatory termination in April 2011 is timely and may proceed.

Mr. Abdul-Baaqiy insists, without basis, that all of his claims are timely.  Opp'n at 26.  Because he does not provide any facts or law to support his argument, he has conceded the point.  *See* LcvR 7(h); *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

To be clear, even though summary judgment will be granted in favor of Fannie Mae on the DCHRA claims based on performance reviews, Plaintiff's claim for discriminatory termination will remain and prior events, if relevant, may be presented.[7]  Because Plaintiff alleges that the "forced ranking" policy was part of the race discrimination that led to his termination, the policy remains at issue in this case.

### C. Motion to Strike Class Allegations

"In determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)

---

[7] In contrast to the one-year limitations period that applies to the DCHRA claim, a three-year statute of limitations applies to the § 1981 claim.  *See Banks v. Chesapeake and Potomac Telephone Co.*, 802 F.2d 1416, 1418-1429 (D.C. Cir. 1986) (finding that the three-year limitations period under D.C. Code § 12-301(8) for personal injury actions applies to § 1981 claims, not the one-year limitations period under DCHRA).

(internal quotation marks and citation omitted).  Federal Rule of Civil Procedure 23(a) provides

that one or more members of a class may sue on behalf of all members if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

*See* Fed. R. Civ. P. 23(a).  These standards are referred to as the numerosity, commonality,

typicality, and adequacy requirements.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

2550 (2011).  If a claim fails to meet any of these requirements, the proposed class cannot be

certified.  "Failure to adequately demonstrate any of the four is fatal to class certification."

*Moore v. Napolitano*, 269 F.R.D. 21, 27 (D.D.C. 2010).  Courts have broad discretion in

determining whether to permit a case to proceed as a class action, *see Hartman v. Duffey*, 19

F.3d 1459, 1471 (D.C. Cir. 1994), and a defendant may move to strike class action allegations at

any time, *see* LCvR 23.1(b).

Fannie Mae moves to strike the class action allegations because Mr. Abdul-

Baaqiy does not and cannot meet the typicality requirement under Rule 23(a)(3).  Plaintiff

arbitrated his claim as required by the Dispute Resolution Policy, but he cannot represent

putative class members here because such putative class members must arbitrate their own

claims.  *See* MTD/Partial MSJ at 33.  The Dispute Resolution Policy binds all Fannie Mae

employees to arbitration:

> The effective date of the Policy is March 16, 1998.  On that date, the Policy becomes a condition of employment for all Fannie Mae employees.  This means that, by starting or continuing to work for Fannie Mae on or after that date, each employee is indicating that he

or she accepts the Policy as a condition of employment and agrees
to be bound by it.  Fannie Mae also promises to be bound by the
Policy.

1.  Arbitration as Prerequisite to Lawsuit.  If an employee[ ] has a
claim that is covered under Section 2 of this Policy [covering
discrimination claims], he or she must arbitrate the claim under this
Policy before bringing suit on it in court.

MTD/Partial MSJ, Ex. A to Lam Decl. (Dispute Resolution Policy).[8]

Courts have held that a plaintiff's claims are not typical of a potential class when
the plaintiff is not required to arbitrate but potential class members are.  *See Quinlan v. Macy's
Corporate Servs.*, Civ. No. 12-00737DDP, 2013 WL 11091572, at *3 (C.D. Cal. Aug. 22, 2013)
(plaintiff was atypical of the class because he was a union member and not required to arbitrate,
while class members were non-union and subject to mandatory arbitration); *Renton v. Kaiser
Found. Health Plan, Inc.*, Civ. No. C00-5370RJB, 2001 WL 1218773, at *7 (W.D. Wash. Sept.
24, 2001) (named plaintiff was atypical because she was not compelled to arbitrate like proposed
class members were); *see Zieger v. Advance Am. Cash Advance Ctrs., Inc.*, Civ. No. 13-1614-
GMS, 2014 WL 7388365, at *7 (D. Del. Dec. 29, 2014) (plaintiff failed to meet numerosity
requirement because he was a class of one, as the only person who was not bound to arbitration).

Mr. Abdul-Baaqiy is the only Fannie Mae employee who has completed
mandatory arbitration of the claims set forth in the Amended Complaint.  He cannot meet the
typicality requirement because the members of the potential class have not arbitrated.  He argues
that this is unfair because he arbitrated only his individual claim and he was not permitted to
bring class claims in arbitration.  His argument has logic but leads nowhere as arbitration clauses
are favored, *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011), and presumed to

---

[8] The Policy was recently amended to provide that claims brought to arbitration must be brought
on an individual and not a class basis.  Opp'n, Ex. Y (FAQs re 1/21/15 Arbitration Agreement).

be enforceable, *see* 9 U.S.C. § 2.  In *AT&T*, the Supreme Court was confronted with a state law rule that invalidated an arbitration agreement as unconscionable because the agreement prohibited class arbitration.  The Court held that the Federal Arbitration Act preempted the state law rule and the arbitration agreement was enforceable even though class claims were not arbitrable.  563 U.S. at 340-52; *see also Am. Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2308 (2013) (antitrust claims were subject to mandatory arbitration even when class claims were not arbitrable and the prosecution of the claims on an individual basis was not economical). This Court is bound by these decisions.

Mr. Abdul-Baaqiy's claims are atypical of the alleged class because he is the only member who has exhausted his obligation to arbitrate.  All other members of the possible class are subject to mandatory arbitration before they are free to sue in court.  Because Plaintiff has failed to meet the typicality requirement, his class action claims will be stricken from the Amended Complaint.

### III. CONCLUSION

For the reasons set forth above, Fannie Mae's motion to dismiss and for partial summary judgment will be granted in part and denied in part.  The motion will be granted to the extent that summary judgment will be entered in favor of Fannie Mae regarding the DCHRA claims based on performance appraisals issued before March 2011.  In addition, Plaintiff's class action claims will be stricken.  The motion will be denied in all other respects.  The Court has jurisdiction over the DCHRA claim.  A memorializing Order accompanies this Opinion.

Date: December 11, 2015

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge