## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SADDIQ ABDUL-BAAQIY** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    **Case No. 1:15-cv-00450-RMC** |
| | ) |
| **FEDERAL NATIONAL MORTGAGE** | ) |
| **ASSOCIATION** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FANNIE MAE'S MOTION FOR SUMMARY JUDGMENT

Comes now Plaintiff Saddiq Abdul-Baaqiy, by and through counsel, and files this Memorandum of Points and Authorities in Opposition to Defendant Fannie Mae's Motion for Summary Judgment,[1] and in support thereof states as follows.

### Introduction

Plaintiff Saddiq Abdul-Baaqiy, an African American, worked for Fannie Mae from 1996 to 1999 and from 2001 to 2011. Plaintiff Abdul-Baaqiy filed a two count amended complaint against Fannie Mae, alleging race discrimination in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 (Count I) and the District of Columbia Human Rights Act ("DCHRA") (Count II). Specially, Plaintiff alleges disparate treatment and disparate impact when Fannie Mae implemented a new performance review policy across the organization, establishing in each department a quota for the number of high and low performance reviews in December 2008. Following 2008, each department could not place more than five percent of its

---

[1] Defendant Fannie Mae's "Statement of Points and Authorities in Support of Defendant Fannie Mae's Motion for Summary Judgment" is cited herein as "FM's Mem.," and exhibits attached thereto are cited "FM's Ex. [x]."

employees in the highest rating category and was required to place at least twenty percent of its employees in the lowest possible ranking. This new comparative rating system ranked employees according to their performance as compared to their peers and employees received the lowest possible ranking even when they met their individual performance objectives. Defendant Fannie Mae does not dispute that the performance ranking distribution was mandatory for the relevant period for the purposes of its motion. FM Mem. at 5 n. 2. Plaintiff contends that the policy gave managers the discretion and impetus to target certain groups of employees - particularly African Americans - for poor performance reviews and required managers to justify poor performance reviews with false accusations of misconduct and other stereotypical and subjective assessments of employees' performance. He maintains that he was subjected to this discriminatory policy when he was issued a series of discriminatory performance reviews beginning with his 2009 mid-year evaluation and when he was terminated in April 2011 for purported performance deficiencies based on the discriminatory performance reviews.

Defendant Fannie Mae filed a motion for summary judgment on all counts.  Fannie Mae's motion inappropriately relies on disputed facts to "vehemently den[y]" direct evidence of discrimination and construct a legitimate, non-discriminatory reason to terminate Plaintiff Abdul-Baaqiy based on his purported performance deficiencies. However, contemporaneous evidence show that: (1) during the 2009 mid-year review, Steven Gonsalves, Plaintiff's manager of a mere three months, who called him a racially derogatory name, placed his only two African-American subordinates into the lowest ranking and compared Plaintiff's performance with the performance of his peers in higher level positions; (2) Mr. Gonsalves gave Plaintiff the lowest possible year-end rating in 2009, even though both Mr. Gonsalves and Plaintiff's peers rated Plaintiff above average when compared to Plaintiff's coworkers, and Mr. Gonsalves initially

gave Plaintiff all "on-course ratings" that corresponded to his compliments of Plaintiff's performance, but later altered Plaintiff's ratings; (3) Sarbari Roy, Plaintiff's new supervisor of a few months, gave Plaintiff a late "off-course" rating for the 2010 mid-year review, even though Ms. Roy had not supervised Plaintiff during the relevant period and had not given Plaintiff any feedback to allow him to actually improve; and (4) Ms. Roy gave Plaintiff the lowest possible 2010 year-end review after Mr. Blundell had already decided to manage Plaintiff out of the company. Plaintiff was terminated shortly after he returned from Short Term Disability ("STD"), and he never had the opportunity to demonstrate improvement based on the Performance Improvement Plan ("PIP") issued to him. The record evidence clearly shows that Plaintiff was targeted for termination due to the forced rating system and raises an inference that Defendant Fannie Mae's justifications of performance deficiencies were pretext for discrimination.

Defendant also argues in its motion for summary judgment that Plaintiff Abdul-Baaqiy has no statistical evidence that the forced ranking policy had a disparate impact on African-Americans, and Defendant contends that Plaintiff has not explained how the policy caused the disparity. However, the record evidence shows that American-Americans were disproportionately impacted by the forced ranking system and Plaintiff's termination was a result of this forced ranking system. Further, Beverly Lynn Everson-Jones, a then-Director within MHA, Plaintiff's division, with access to the review data, attested to Defendant's discriminatory acts and disparate treatment, which were amplified by the forced review system that forced managers to pick sacrificial lambs. Plaintiff has shown sufficient evidence of disparate impact to overcome summary judgment.

Notably, Defendant's motion for summary judgment contains multiple false statements and mischaracterizations that entirely disregard the bulk of Plaintiff's evidence, which ignores

the basic principle of the summary judgment standard – that facts must be viewed in the light most favorable to the nonmovant party.

The misrepresentations vary from minor to more substantive. For example, this Court noted Plaintiff's above average peer rating score of 4.28 in 2009. Ex. S at 6, 10, 12. Defendant Fannie Mae cites an email *not disclosed* during discovery from before the 2009 review period even commenced to claim that "*[i]n 2009*, Plaintiff's peers (chosen by him as raters) rated Plaintiff 4.39 out of a 6, placing him squarely in the lowest 25% of employees at his level. FM Mem. at 14 (emphasis added) (citing Sember Decl., ¶ 14,-15, Ex. 10 (FM_AB 000486-91), Ex. 12 (email dated *December 29, 2008*)). Further, Defendant Fannie Mae implied that Plaintiff had extensive discovery and a hearing in front of a "retired federal Judge," *see* FM Mem. at 1, when Judge Robert Levie, a former judge with the D.C. Superior Court and not a former federal judge, limited Plaintiff to the issue of whether he was an appropriate class representative during the hearing and consequently also limited the scope of discovery. Ex. R. These two mischaracterizations are only representative of the numerous falsehoods contained in Defendant Fannie Mae's motion.

For these reasons, which are set forth fully below, Plaintiff requests the Court deny Fannie Mae's Motion for Summary Judgment.

## **Factual Allegations**

Plaintiff's Employment at Fannie Mae Before 2008

Plaintiff Saddiq Abdul Baaqiy is an African American male. Ex. M (Pl.'s Oct. 2, 2015 Decl.) at ¶ 2. He began employment at Fannie Mae from 1996 to 1999 and again from 2001 to 2011. *Id.* From 2001 through 2008, Plaintiff received Fully Successful performance reviews. *See*

FM 91-125; Exhibit A (Plaintiff's performance evaluation). In 2009, Plaintiff even received a performance bonus for a successful performance rating in 2008. *Id.* at ¶ 3; FM 132.

Fannie Mae's Forced Ranking Policy

Prior to December 2008, Fannie Mae evaluated its employees based on objective performance standards. *See* Ex. A. Under this system and at the beginning of each performance review period, managers were instructed to identify specific objectives, responsibilities, priorities, and projects, and additionally to specify certain "Success Qualities" – presumably skills that were required for the employee to complete the objectives. *Id.* at 1. At the end of the performance review period, managers were instructed to provide a summary of results achieved against each planned objective and to evaluate the extent to which "Success Qualities" were demonstrated. *Id.* at 1-2. Fannie Mae had a 360 review process that accounted for feedback from managers, peers, and clients, while comparing an employee to his individual goals. Exhibit P (Wolf Dep. Tr.) at 14:9-18. Overall performance ratings were to be assigned based on consideration of objectives achieved and "Success Qualities." Ex. A at 2. "Fannie Mae was…a highly competitive company that hires high-performing people. So it was very possible that prior to [the forced ranking policy in 2008] you would have ten people and all ten of them would have at least met expectations; many of them have exceeded expectations." Exhibit G (Everson-Jones Dep. Tr.) at 31:11-17.

The December 2008 performance review policy radically overhauled Fannie Mae's performance evaluation system by doing away with the objective performance evaluation metrics and implementing a system whereby employees would be subjectively evaluated "relative to their peers" so that at most five percent of employees receive the highest rating of "Significantly Exceeds" ("SE") and at least twenty percent receive the lowest ratings of "Fully Meet (–)" ("FM-

") and Significant Issues ("SI"). Exhibit P (Attachment 2). The policy specifically acknowledged that "FM- rated employees may meet yearly performance goals but have lower relative performance to same level peers." *Id.* While only four percent of employees were classified as FM- or SI in 2007, the policy mandated that at least twenty percent of employees must be classified as FM- or SI. *Id.*

Following December 2008, the phrase "relative to their peers" was pervasively utilized to instruct managers how to evaluate their employees, whereas this phrase is virtually absent from any performance review policies issued prior to December 2008. *Compare* Ex. P (Attachment 2) *and* Ex. A ("Consider relativity of your employee's performance to his/her peers.") *with* Ex. A (performance evaluated based on previously established objectives and Success Qualities). The new policy focused on an employee's performance to others versus his individual objectives. Ex. P at 22:16-23:3. In order to determine the proper comparison group, managers should have considered the following factors:  "Expertise- similar knowledge base or discipline to perform a specific job; Strategy Role- executes similar tactical and/or strategic responsibility; Decision Authority- similar decision-making authority; Degree/Level of Influence- similar expected range of influence stakeholders, peers, colleagues, clients, etc within and/or outside the division and/or external to the company; Impact- oversees or manages similar projects and/or initiatives; contributes to similar projects and/or initiatives." EX. B (FM_AB41).

After the policy was passed, "it was sort of like every man for himself, every team for themselves." Ex. G at 43:2-3. During the calibration sessions, managers need to pick a "sacrificial lamb" and "people could be targeted." *Id.* at 43:15, 43:24. Managers first placed people in categories then justify the ratings with opinion rather than facts. *Id.* at 114:1-3, 115:20-116:3. For example, an African-American subordinate of Gleb Resnick had his rating lowered

because Mr. Resnick disliked that the subordinate became "frustrated when something [did] not go [his] way" even though it was a natural reaction and other managers at the calibration meeting did not believe the subordinate tend to be hotheaded or have a temper. *Id.* at 52:23-55:20.

While managers did not state that the ratings were based on race, "people doing similar work, getting similar results [would] end[] up in two different places." *Id.* at 116:1-3. The forced ranking system amplified the pre-existing racial difference "because before [managers] had more latitude to be able to rate people on a level[ed] playing field. Once the force rankings [was instituted], then [managers were] searching for people that [they could] put into these [ranking] buckets." *Id.* at 125:15-21. In order to counteract the amplification, managers must "go into the calibration ready to defendant" their review but very few were willing to defend their subordinates against the insistence of management to conform to distribution expectations. Ex. G at 141:1-17; 145:16-24.

In 2009, Fannie Mae adjusted the requisite percentage of employees for each performance level, but the new policy focused on relative performance and did not alter the mandatory forced ranking system in any relevant manner. Exhibit P (ATTACHMENT 4) (FM_AB15-19); FM Mem. at 5 n. 2; Ex. I (FM_AB228) ("This version still has 'continue to work out employees who do not perform.' While correct, should it be softened into the context of the SMG and the fact that the deck might get further than that group?"); Ex. I (FM_AB325) ("the word 'grow' that was in here before may trigger people to think about development or training and I think what we are saying is that one could meet all goals but contributed less than others and therefore what we are looking for is more contribution"). The new policy is a four-phase process comprising of divisional planning, pre-calibration preparation, calibration, and post-calibration. Ex. B (Calibration Overview: Job Aid). Calibration sessions are defined as

"management forums led by the Fannie Mae leaders" to assist managers in "assess[ing] relative performance of employees….before finalizing a rating and written management assessment." *Id.* Prior to the calibration session, managers are instructed to prepare a draft initial performance evaluation and rating. Ex. B. Managers are instructed to evaluate their employees "relative to peers," meaning that even if an employee is "has met or is on course for all goals" the manager is expected to "clearly articulate how [the] employee is performing against peers." Ex. E at 3-4. In instructing managers on developing ratings for their employees, Fannie Mae states:

> When gathering your feedback, please keep in mind that we differentiate employees relative to their peers to instill a performance-based culture. To do so, we must:
> …
> · Differentiate performance – compare employees to their peers through a calibration process and adhere to the agreed upon ratings distribution.
> …

Ex. B (emphasis added).

Following the initial rating process, managers attend the calibration session with Fannie Mae upper management. At the calibration session, management discuss the performance ratings issued by each division and, crucially, "[r]eview all employees against targeted distribution." Ex. B. Fannie Mae explicitly states that "Distribution targets are mandatory at the division level." *Id.* (emphasis added).

Impact of Forced Ranking System

At least two former Fannie Mae Directors have provided statements under oath that the forced ranking policy/practice continued after 2009 and the ranking adversely impacted certain populations irrespective of performance and contribution. Beverly Everson-Jones, an African American female who was employed at Fannie Mae from 1997 through 2013 as a Director, stated:

I believe the forced ranking policy had an adverse impact on minority employees. During several calibrations, I pointed out that there was potentially unfair impact to minorities. Specifically African-Americans, seemed to have more scrutiny placed on their performance, were less likely to have budget/other resources to assist with achieving their goals and were more apt to have anecdotic information attributed to their performance. Additionally, when managers were questioned about the individual's response to coaching, there was generally limited input provided on how they had coached the person for success. In many cases, when goals were described, higher ranking staff or managers who were African-Americans would have more broad or challenging responsibilities for which they achieved their goals but would be rated lower than peers with identifiably less challenging goals. Also, HR specialists tended to limit their involvement to supporting the needs of the division's officers instead of seeking to provide a level playing field for all team members. Finally, managers who were poor presenters or themselves in jeopardy of poor performance ratings seemed less likely to successful defend their team member's performance.

*Id.* at ¶ 9.

Ms. Everson-Jones worked in the business office of Fannie Mae and had access to the list of employees and some employment information, including how bonuses were spread. Ex. G at 64:5-11, 102:23. Thus, Ms. Everson-Jones had access to the division employees' ratings. *Id.* at 103:1-3. Ms. Everson-Jones noted that "a lot of minorities [were] laid off during the years from probably 2009 through 2013." *Id.* at 64:16-17. She noted that women, African-Americans, and those over 50 were disproportionately targeted. *Id.* at 65:1-5. Ms. Everson-Jones noted that she became the "only African-American woman in [her] department as a director. [She] was one of the few African-Americans still at the director level within the division compared to when [she] came into the division." *Id.* at 66:1-5.

Ms. Everson-Jones remembered at least four instances in which the rating of minority employees were treated unfairly due to the forced ranking system due to their race. *Id.* at 111:20-121:23. Ms. Everson-Jones noted that African-Americans comprised of ten to twenty percent of the department but approximately forty percent of the lower rankings. *Id.* at 136:19-137:8.

Ana Lapera, a Hispanic female and a former Director at Fannie Mae, was employed at Fannie Mae from 1994 through November 2013. Ex. K at ¶ 3. Ms. Lapera is familiar with Fannie Mae's performance evaluation system. *Id.* at ¶ 6. She also attested under oath that she was forced to change the rating of two employees. Ex K at ¶ 10-11. In late 2012, Shandell Harris, her team's Human Resources Business Partner, called Ms. Lapera (always phone, no e-mail) to ask her to ask Dan Cousino, one of Ms. Lapera's Directors, to change Kristin Lutz, one of his direct reports, from a 2 (Exceeds Expectations) to a 3 (Meets Expectations). *Id.* Since Ms. Lapera did not do it right away because she did not agree with this action, Shandell Harris called again and gave Ms. Lapera a deadline to force Dan Cousino to change the rating. *Id.*

Ms. Lapera had rated Patricia Brumbaugh as a 2 (Exceeds Expectations), defended the rating during the session, and then was told by her boss (Kathy Keller) and the HR Business Partner that she had to downgrade the rating to a 3 (Meets Expectations). Ex. K at ¶ 11. Ms. Lapera believes that the forced ranking policy had an adverse impact on employees who did not fit the exact criteria that their particular management team embraced and was used to discriminate against certain employees. *Id.* at ¶ 12. As an example, Ms. Lapera was also told that under the existing team leadership, it would be very hard to give a rating higher than 3 to Shirley Cruz regardless of her accomplishments because of her accent. *Id.* Ms. Cruz is Hispanic. *Id.*

Fannie Mae's management was aware that their employees perceived the rating system as "weakly based or unfair" and targeted certain people for termination. Exhibit Q. (FM_AB210-211); FM_AB267. However, Defendant simply reduced the percentage of employees managers must score within the lowest category while holding managers accountable for "meeting the distribution in performance and compensation within their areas." *Id.* at 2.

Impact of Forced Ranking Policy on Plaintiff After 2008

In April 2009, Plaintiff Abdul-Baaqiy was transferred from the Servicing Investor Reporting ("SIR") team under Jayant Swamy to the IR2 team under Steve Gonsalves, Caucasian, and reported to him until early 2010. Ex. C (Attachment 1) (April 22, 2019 email re: SIR Staff Transitioning to IR2). Ex. M (Pl.'s Oct. 2, 2015 Decl.) at ¶ 6. After reporting to Mr. Gonsalves for only a few month, Mr. Gonsalves referred to Plaintiff as "boy" in or around early 2010. Exhibit J (Amended Ans. FM Interrog.) at 5.

After supervising Plaintiff for a period of three months, Mr. Gonsalves was ordered by Malcolm Blundell, Plaintiff's second level supervisor to issue to Plaintiff an "off target" mid-year performance rating. Ex. L (Attachment 1); Ex. M at ¶ 6. The mid-year review influences the year-end review, and an employee must "extraordinarily better or worse" to change it. Ex. G at 85:12-15. Mr. Blundell sent Mr. Gonsalves an email which stated "[w]e have 30 individual contributor FTEs on the team. The six people on the Les' original list below [including Plaintiff] are to be rated off track, and everybody else on track. Get it done by 10 AM tomorrow morning." Ex. L (Attachment 1). Mr. Gonsalves responded a short time later, "Done." *Id.* Mr. Gonsalves issued Plaintiff a 2009 mid year performance review of "off track" and did not include any comments to support or justify the "off track" rating. Ex. A. It would be difficult for an employee fix the issues listed in the mid-year review if the employee did not know what caused the off track rating. Ex. G at 86:20-23. Further, African-American employees were less likely to be coached by their managers so that they could later obtain an on-track rating. *Id.* at 128:1-9, 130:14-16.

Of the six individuals whom Mr. Blundell ordered to rate "off track," three were African American. *Id.*; Ex. C at 49:12-14. Both individuals Mr. Gonsalves added to the list, Plaintiff and Anthony Herndon, were African American. Ex. L at 57:14-19. Mr. Gonsalves acknowledged that

he was forced to place people on the list. *Id.* at 65:5-16. The email chain explicitly noted that as "expect[ed], not everyone on th[e] list is because of their performance against goals. Several made the list as a result of the requirement to have 20%. So, they ended up ranking below their IR2 peers." *Id.* at 2. The email further noted that the "IR2 staff is among the best in Fannie Mae, working on a critical and extremely challenging project with the highest visibility." *Id.* While Plaintiff had only reported to Mr. Gonsalves for three month, the email did not acknowledge that Plaintiff was new to the position. *See id.* at 1-2. Amol Chokshi transferred from SIR to IR2 at the same time Plaintiff transferred from SIR to IR2. Ex. C (Attachment 1) (April 22, 2009 email re: SIR Staff Transitioning to IR2). The mid-year performance ranking recognized that Mr. Chokshi was new to the position but did not afford Plaintiff the same recognition of his transition.[2] Ex. L (Attachment 1) at 2.

Further, Plaintiff was the only Application Developer II or level 4 on Mr. Gonsalves' team, which was otherwise comprised of Application Developer IIIs or level 5s. Ex. L at 38:22-39:10. Level III programmers receive a higher pay grade than level II programmers because level III programs were assigned more complex tasks, but Plaintiff was placed into the same comparison group as his level 5 peers. Ex. C at 63:11-17. The comparative policy made it difficult for Plaintiff to compete with his higher level peers. *See* Ex. I (FM_AB345). ("even if all of your direct reports met their goals 100 percent, you should take into account that some were working against more difficult goals than others or showed greater leadership qualities."). In practice everyone with the same job title should be placed in the peer group instead of department; thus all of Application Developer II within Operations and Technology Division

---

[2] Fannie Mae's management team knew that employees who were new to the role was further impacted by the policy. FM_AB239.

should be placed within the same peer group. *See* Exhibit G (Everson-Jones Dep. Tr.) at 13:10-21.

For the 2009 year end evaluation, Mr. Gonsalves prepared an unsigned copy of the year end performance review for Plaintiff. Ex. L (Attachment 3). Fannie Mae's 2009 year end evaluation system permitted managers to rate the employee's status toward meeting their goals in one of four levels –Completed, On Course, Off Course, Not Applicable. *Id.* at 227. For the year end evaluation initially completed by Mr. Gonsalves in 2009, Plaintiff was given the highest rating of "Completed" in every goal. *Id.* 227-234. Among Mr. Gonsalves' comments about Plaintiff was Plaintiff "Delivered assignments in a timely manner. Was one of the 'go to' people for support" in response to Goal 1.5, and "Continues to be an advocate, if not a champion of standards compliance. Just needs to soften his approach in communication of this advocacy" in response to Goal 1.5. *Id.* at 230-231. Finally, in the Overall Rating section, Mr. Gonsalves noted that: "[t]he early part of the year was a challenge for Saddiq. After joining HAMP, he attempted to take on roles and responsibilities that exceeded his skills and abilities. After mid year coaching, he showed improvements in building productive relationships and took on roles and assignments more in line with his abilities and skills. There are still some issues with quality and communication." *Id.* at 233.

In addition to Mr. Gonsalves' comments, Plaintiff received a rating out of six from his peers. Exhibit A (peer rating instructions FM_AB143, 146, 205) at 2. According to Fannie Mae, a rating of four out of six is considered above average when compared to others at the same level. Ex. A at 2. Defendant emphasized that "it would be extremely rare for any employee to receive 5's and 6's in all areas, or 4's and 5's in all areas. Please be very thoughtful when rating participants." *Id.* at 1, 3. In 2009, Plaintiff Abdul-Baaqiy's coworkers gave him a rating of 4.28

13

out of 6. Exhibit A (FM_AB113, 126) at 2. Indeed, even Mr. Gonsalves scored Plaintiff above average at a 4.3 out of 6. Plaintiff's peer review score without his own input was 4.28, the exact same score he received in 2008 with a meet expectations rating. *Compare* Ex. A (FM_AB113, 126) at 1 *with* Ex. A (FM_AB113, 126) at 2.

Defendant Fannie Mae argues that Plaintiff Abdul-Baaqiy's coworkers also had negative comments regarding his performance. FM Mem. at 28. However, the Accountability Survey specifically asked Plaintiff's peers to comment on his strength and weaknesses and these comments are already accounted for in the above average rating Plaintiff received from his peers and supervisors. *See* Ex. A (FM_AB113, 126). To obtain a rating above "do not meet expectation," Plaintiff need not be entirely free of error and areas of improvement, he simply needs to be considered above average when compared to others at the same level. Ex. A at 2.

After meeting with his Division Director, Joe Jucha, Mr. Gonsalves changed Plaintiff's performance review, and in particular changed Goals 1.2, 1.3 and 2.3 from completed to off course. Ex. L (Gonsalves Dep.) at 29:18-22- 32:18. As a result of this meeting, Mr. Gonsalves issued Plaintiff a "do not meet expectations" review for year end 2009. *Id.*; Ex. L (Attachment 4); Ex. M (Pl.'s Oct. 2, 2015 Decl.) at ¶ 7. Mr. Gonsalves told Plaintiff he was only receiving this rating because of Fannie Mae's mandate to place a certain number of employees in the "Does Not Meet" category. Ex. M at ¶ 7; Ex. N ¶ 7. Mr. Gonsalves further assured Plaintiff that he had nothing to worry about as a result of receiving a "Does Not Meet" rating. Ex. N ¶ 7. Plaintiff discussed with his African American colleagues that they received unwarranted and false performance appraisals. Ex. M at ¶ 7.

Plaintiff did not have any work assigned to him for two to three months in 2010. *Id.* at ¶ 8; *see also* FM_AB267 ("Folks get territorial over work assignments, elbow each other for

credit, and have disincentives to support projects for which they get no glory."). In 2010, Mr. Abdul-Baaqiy was assigned to work on project tasks to build a new function to address compensation. Ex. M at ¶ 8. This assignment was outside the Reports domain where Mr. Abdul-Baaqiy had worked the previous several years. *Id.* By the time Mr. Abdul-Baaqiy had completed approximately thirty percent of the tasks, his job duties on the project began to be systematically removed. *Id.* at ¶ 9. He had already completed most of the tasks assigned to him, but his involvement on the project gradually lessened, and he was not informed that his duties were removed while being criticized for his lack of availability. *Id.* Mr. Abdul-Baaqiy requested that he and other Reports developers be added to the team's mailing list so he could remain abreast of the project's development, but it was not until several weeks later that his request was granted. Ex. M at ¶ 10. Eventually, Mr. Abdul-Baaqiy was left with no tasks on the compensation project, and after a team reorganization he went for two to three months with no new tasks assigned to him.[3] *Id.* Mr. Abdul-Baaqiy repeatedly expressed concern to management that he was underutilized, but no remedial action was taken. *Id.*

Plaintiff began reporting to Sabari Roy, an Asian female, in or around early October 2010. Ex. M ¶ 11; Ex. S (Attachment 2 to Roy deposition) at FM 200. Ms. Roy issued Plaintiff's mid year 2010 review in or around November 2010 even though the mid year review should have been complete in July 2010, before Plaintiff even reported to Ms. Roy. Exhibit A (FM148-51). Ms. Roy did not provide any justification for the "off track" review and simply stated that Plaintiff "[h]as demonstrated his initiative to improve." *Id.* at 4.

---

[3] Defendant argues that the fact Plaintiff received no work in 2010 does not qualify as an adverse action. FM Mem. at 31. However, this fact shows that Fannie Mae's forced ranking system produced an environment conducive to disparate treatment of African-American employees through arbitrary and weak distinctions. *See* Exhibit Q (FM_AB210-211); FM_AB267.

In late 2010 and early 2011, Plaintiff's managers expressed their desire to "manage…out" Plaintiff from his employment, and requested an "accelerated process" to do so. Ex. C (attachment 6). Malcolm Blundell wished to "manage...out" Plaintiff due to his reviews in 2009 and 2010, even though he had no input in the reviews and simply looked at the "end product" without knowledge of Plaintiff's work. Ex. C (Blundell Dep. Tr.) at 24:7-9, 25:5-11, 33:12-18. Mr. Blundell acknowledged that Plaintiff's 2009 midyear review was a factor in his termination. *Id.* at 26:5-15. Mr. Blundell acknowledged that the "decision had already been made that [Plaintiff] was going to be managed out" even though Plaintiff has not even received his 2010 year end review when Mr. Blundell decided to manage out Plaintiff. *Id.* at 90:19-21.

When Mr. Blundell contacted Cheryl Sember, a human resources representative, regarding the immediate termination of Plaintiff in December 2010, Ms. Sember stated that the immediate termination was "not the expectation of the firm" and requested that Mr. Blundell provide a justification for the immediate termination. Ex. C (attachment 6). Ms. Sember indicated that there was a "normal" process, which involved a PIP, MOC, Final Reprimand, monitoring and documentation before termination. *Id.* Mr. Blundell did not attempt to justify the immediate termination of Plaintiff Abdul-Baaqiy and instead had documentations prepared to justify the termination. *See id.*

Plaintiff received a "Do Not Meet Expectations" rating on his 2010 year-end performance evaluation. Ex. A (FM193-99) (Plaintiff's 2010 performance evaluation) at FM 199. The review observes, however, that "the quality of the ultimate work product was up to par" but that "relative to his peers" his performance needs improvement. *Id.* at FM 197. Thus, in 2010 Plaintiff met his objective benchmarks, but due to the requirement that Plaintiff be evaluated subjectively "relative to his peers" he was forced into the lowest distribution level of Fannie

Mae's forced ranking system. Douglas Wolf, an Application Developer Analyst III who worked with Plaintiff Abdul-Baaqiy on a major project, expressly told Ms. Roy that Plaintiff "performed [the required] tasks at an expected level." Ex. S at 44:8-17, Ex. O (Attachment 7). According to Mr. Wolf, Plaintiff's understanding of the detailed program and database design was "consistent with other level 'II' developers [Mr. Wolf] ha[d] worked with on reports and batch development teams." Further, Plaintiff compensated for his lower level with a "careful methodical approach." Ex. O (Attachment 7).

Mr. Abdul-Baaqiy's 2010 performance review was conducted by a Sarbari Roy, whom he had reported to for approximately three months. Ex. A (FM193-99); Ex. M ¶ 13. This performance review identified several alleged deficiencies. Ex. A (FM193-99); Ex. M ¶ 13. Like his prior review, however, the 2010 performance review relied heavily on subjective criteria, while largely disregarding the objective goals that Mr. Abdul-Baaqiy met with success. Ex. A (FM193-99); Ex. M ¶ 13. Indeed, Ms. Roy could not even recall any incident that warranted a rating for four for Plaintiff. Ex. S at 51:8-13. For instance, Mr. Abdul-Baaqiy was underutilized and given no concrete guidance in performing the scant duties he was assigned. Ex. M ¶ 14. Furthermore, Mr. Abdul-Baaqiy's performance review falsely claimed that he had skill gaps, yet Mr. Abdul-Baaqiy was one of four individuals in the position of Application Developer Analyst II out of more than forty technical full time employees. Ex. A (FM193-99) at FM 198; Ex. M ¶ 14. Given the technical expertise on his team, the fact that his experience was largely within the Reports domain, the lack of guidance he was given by his supervisors, and the fact that he met all the objective goals of the project, characterizing Plaintiff as lacking certain skills was highly inaccurate and unfairly subjective. Ex. A (FM193-99); Ex. M ¶ 15.

On February 4, 2011, Mr. Blundell again emphasized that Plaintiff Adbul-Baaqiy would be managed out. Exhibit C (Attachment 8). Mr. Blundell planned to terminate Plaintiff in April 2011. *Id.* Around the same period, Mr. Blundell wanted to manage out Ricky Staton, another African-American employee. Ex. C at 86:1-8. Mr. Staton retired only after he received his off track or does not meet expectations rating. *Id.* at 86:20-87:11.

On or around February 10, 2011, Plaintiff was issued a Memorandum of Concern dated January 25, 2011, which cited an "off target" mid-year 2010 rating and the 2009 and 2010 "do not meet expectations" year end reviews. Ex. S (Attachment 5 to Roy deposition) at FM 431. Plaintiff refused to sign the Memorandum of concern. *Id.* On the same day, Plaintiff was placed on a Performance Improvement Plan ("PIP"). Ex. C Attachment 9. Due to the work stress Plaintiff was on Short Term Disability starting in February 2012. *See* Exhibit C (Attachment 11). Shortly after his returning to work, Plaintiff was terminated in April 2011.  Ex. M ¶ 16. Plaintiff did not have an opportunity to improve based on the PIP. Generally, employees should be given a "reasonable time frame" to correct their deficiencies. Ex. G at 150:1-14, 152:16-23.

Arbitration Proceedings

On March 12, 2012, Plaintiff Abdul-Baaqiy filed a complaint alleging race discrimination in the D.C. Superior Court, *Abdul-Baaqiy v. Fed. Nat'l Mort. Ass'n*, No. 2012 CA 002386 (D.C. Sup. Ct. 2012). However, the case was dismissed due to Fannie Mae's arbitration agreement and Plaintiff filed a demand for arbitration at JAMS. Exhibit R (Richard Levie Bio and Order). Richard Levie, a retired judge of the D.C. Superior Court, presided over the demand and limited Plaintiff's claim to his class representation status. *Id.* at 3 ("The sole question before the Arbitrator at this juncture is whether or not Claimant is a proper class representative."). JAMS

ruled in favor of Fannie Mae.  While the JAMS decision is building upon Fannie Mae, it is not binding on Plaintiff, who brought the case at bar. Docket Entry No. 1.

### Argument

### I.      Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is a genuine issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The court, therefore, "should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Products, Inc,* 530 U.S. 133, 150 (2000), viewing the evidence in the light most favorable to the non-moving party and according that party the benefit of all reasonable inferences. *Anderson*, 477 U.S. at 255. At this stage of the proceedings, the court is not to make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150. If the evidence presented on a dispositive issue is subject to conflicting interpretations or reasonable persons might differ as to its significance, summary judgment is improper. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Only if, after examining the evidence, the court finds that a party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," is summary judgment appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jackson v. Finnegan*, 101 F.3d 145, 150 (D.C. Cir. 1996). Summary judgment

will only be granted in clear cases. *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (citation omitted).

II.     **Plaintiff has demonstrated an issue of material fact regarding whether he was discharged as a result of Fannie Mae's "forced ranking" policy and not for poor performance.**

To state a *prima facie* claim of disparate treatment discrimination using the *McDonnell Douglas* framework, "the [employee] must establish that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999) (citation omitted). The *McDonnell Douglas prima facie* framework was "never intended to be rigid, mechanized, or ritualistic." *St. Mary Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citation omitted). Rather, it is a "'sensible, orderly way to *evaluate the evidence*' in various contexts." *Gatewood v. D.C. Water & Sewer Auth.*, 82 A.3d 41, 52 n. 60 (D.C. 2013) (emphasis added) (citation omitted). The burden of establishing a *prima facie* case to survive summary judgment is "minimal" and "not onerous." *St. Mary Honor Ctr.*, 509 U.S. at 506; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Once Plaintiff establishes the *prima facie* case, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Plaintiff can then show that the articulated reason is a pretext for discrimination. *Id.* at 803-05. Mr. Abdul-Baaqiy has shown pretext because: a) there is direct evidence of discrimination and a robust *prima facie* case of discrimination, b) he was treated differently from similarly-situated employees, c) and Fannie Mae's justifications for the adverse actions were false.

An employee may demonstrate pretext by showing "that the employer's stated justification for its action was not its true reason . . .," *Joyner v. Sibley Memorial Hosp.*, 826

A.2d 362, 369 (D.C. 2003), or is "unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248, 256 (1981). This may be accomplished by showing that the proffered reason is

false because "in appropriate circumstances, the trier of fact can reasonably infer from the falsity

of the explanation that the employer is dissembling to cover up a discriminatory purpose."

*Reeves*, 530 U.S. at 147; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Indeed, "once the employer's justification has been eliminated, discrimination may well be the

most likely alternative explanation, especially since the employer is in the best position to put

forth the actual reason for its decision." *Reeves*, 530 U.S. at 147. Accordingly, "[a] *prima facie*

case coupled with probative evidence that the employer's explanation is false would counsel

against granting the employer summary judgment unless the employer presented other strong

evidence from which no reasonable factfinder could conclude that there was discrimination."

*Price v. Thompson*, 380 F.3d 209, 214 n.6 (4th Cir. 2004). Mr. Abdul-Baaqiy established that

Defendant's justifications for its disciplinary actions are false and pretextual.

(a) <u>Objective performance cannot be Defendant Fannie Mae's legitimate, non-discriminatory justification under Fannie Mae's own rating system.</u>

Defendant Fannie Mae does not challenge Plaintiff Abdul-Baaqiy's *prima facie* case. *See*

FM Mem. at 1-32. Instead, it argues that Plaintiff Abdul-Baaqiy's performance deficiencies led

to the negative performance reviews in 2009 and 2010 and his termination in 2011. *See id.* at 27-

29. Defendant Fannie Mae's justification is not and cannot be true based on the undisputed

evidence regarding Fannie Mae's ranking system. Defendant Fannie Mae has conceded that

Plaintiff was subjected to a "guided distribution" ranking system from 2009 to 2011. FM Mem.

at 5 n. 2. Under the forced ranking system, achieving one hundred percent of Plaintiff's

performance goals could still result in the lowest possible ranking, because under the new system

Plaintiff performance relative to his peers was the only relevant factor. *See* EX. I (FM_AB345).

("even if all of your direct reports met their goals 100 percent, you should take into account that some were working against more difficult goals than others or showed greater leadership qualities.").

This Court should view Fannie Mae's subjective justifications with caution, because "[a]n employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998); *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1184 (D.C. Cir. 1996). "[P]laintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision." *Aka*, 156 F.3d at 1295.

Defendant Fannie Mae was well aware that the forced ranking system was "weakly based or unfair" and targeted certain people for termination. *See* Exhibit Q (FM_AB210-211); FM_AB267. When forced to distinguish arbitrarily between their subordinates, some of Defendant's managers chose based on racial bias. *See* Ex. F ¶¶ 9-10; Ex. K at ¶¶ 11-12.

(b) Defendant Fannie Mae's 2009 mid-year review of Plaintiff is pretextual.

Plaintiff can establish a strong *prima facie* case for racial discrimination based on his 2009 mid-year review for his 42 U.S.C. § 1981 claim. *See* Ex. S at 13 n. 7 (noting that the statute of limitations for 42 U.S.C. § 1981 claim is longer than DCHRA claim).[4] Plaintiff is an African-American. Ex. M at ¶ 2. The "off track" midyear review constitutes an adverse action because it affects Plaintiff's bonus, ability to transfer, and was a factor his termination. *See* Ex. A (FM193-99)P (ATTACHMENT 4) at 3; Ex. C at 26:5-15; *see also Paschal v. District of Columbia*, 65 F.Supp. 3d 172, 177-78 (D.C. 2014) (holding that an interim performance rating was a materially

---

[4] The statue of limitations for 42 U.S.C. § 1981 is actually four years, *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004), but Plaintiff's claim June 2009 mid-year review is timely regardless of a three or four year statute of limitation. *See* Ex. A; *Abdul-Baaqiy v. Fed. Nat'l Mort. Ass'n*, No. 2012 CA 002386 (D.C. Sup. Ct. 2012).

adverse action). This holding is consistent with decisions issued by the U.S. Court of Appeals for the D.C. Circuit and other circuits. A poor evaluation may be an adverse employment action when it is considered for further action. *Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001) ("excellent" evaluation and a $807 bonus constitutes an adverse employment action, but evaluation not adverse if possible exposure to RIF too remote or unlikely); *Phillips v. Collings,* 256 F.3d 843 (8th Cir. 2001) (finding a poor performance evaluation constituted an adverse action); *Shapiro v. N.Y. City Dep't of Educ*., 2008 U.S. Dist. LEXIS 46327 (S.D.N.Y. June 13, 2008) (performance review qualifies as an adverse action under Title VII where the consequences of a poor rating included, *inter alia,* "damaged professional reputations and stymied careers"); *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 761 (1998) (adverse action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"; *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 377 (4th Cir. 2004) (poor performance evaluation actionable "where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment"). Further, Plaintiff shows that his off-target review was due to his race. Ex. J at 5.

Both direct and circumstantial evidence show that Plaintiff's "off-target" 2009 Mid-Year Performance Review is a pretext for discrimination. Steven Gonsalves, a Caucasian and Mr. Abdul-Baaqiy's then-supervisor, used the racially derogatory term, "boy" to describe Mr. Abdul-Baaqiy, an African-American. Ex. J at 5. The same Steven Gonsalves selected only African-American subordinates for the "off-target" mid-year rating. Ex. L at 57:14-19. Defendant Fannie Mae attempts to characterize Mr. Gonsalves' derogatory comment as a "stray remark" and states that Ms. Gonsalves "vehemently denies" making the remark. FM Mem. at 24, 29-30. However,

"stereotyped remarks can certainly be *evidence* that [race] played a part," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), and Ms. Gonsalves' denials are immaterial during the summary judgment stage. *Anderson*, 477 U.S. at 248. The fact remains that Plaintiff alleged Ms. Gonsalves called him "boy," and Mr. Gonsalves forced African-Americans into the lowest review category. Ex. L at 57:14-19.

Mr. Gonsalves admitted that he was forced to place some subordinates on the list. *Id.* at 65:6-16. Further, the email exchanges between Fannie Mae employees expressly stated that as "expect[ed], not everyone on th[e] list is [there] because of their performance against goals. Several made the list as a result of the requirement to have 20%. So, they ended up ranking below their IR2 peers." Ex. L (Attachment 1) at 2. In addition, the IR2 group was identified as one of the "best" teams at Fannie Mae. *Id.*

At the time of the mid-year review, Mr. Gonsalves had only supervised plaintiff for approximately three months in Plaintiff's new position, but the decision to place Plaintiff as "off-target" failed to acknowledge that Plaintiff was new to the role. *See id.*; Ex. C (Attachment 1). Defendant Fannie Mae considered this mitigating factor for Mr. Chokshi, who transferred at the same time as Plaintiff into the IR2 team, but not Plaintiff. *See id.*

Lastly, Defendant Fannie Mae violated its own policy by comparing Plaintiff, the only Application Developer II on Mr. Gonsalves' team, with the Application Developer IIIs on his team. Ex. L at 38:22-39:10. When employers deviate from established policy, it raises an inference of pretext. *Cf Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003). Application Developer IIIs are paid at a higher grade-level in recognition of their more complex assignments and roles. *See id.* Application Developer II and Application Developer III shared only about half of the same assignments. *Id.* at 39:20-21. These differences mean that Application Developer II

and III had different expertise, decision authority, degree/level of influence, and impact. *See id.*; EX. B (FM_AB41). In addition to the deference in pay and duties, Fannie Mae employees recognize that Application Developer II does not have the same skill set at Application Developer III. *See* Ex. O (Attachment 7). Under Defendant Fannie Mae's established comparative review system, Plaintiff would still receive an "off-track" review even if he perfectly achieved all his performance objectives because his peers would still have more complex assignments and roles. *See* EX. I (FM_AB345).. The fact that Fannie Mae compared Plaintiff only to higher level developers in violation of its own policy raises an inference of pretext. The factual evidence raises a reasonable inference that when pressured, Mr. Gonsalves placed Plaintiff Abdul-Baaqiy, an African-American, into an "off-track" rating despite the fact that Mr. Gonsalves only supervised Plaintiff for three months and Plaintiff was his only Application Developer II.

(c) Defendant Fannie Mae's 2009 year-end review of Plaintiff is pretextual.

Plaintiff has shown that his "do not meet expectations" review for year end 2009 is false and pretextual, because contemporaneous evidence shows that Plaintiff's supervisor and peers praised his performance as above average when compared to his peers, *see* Ex. A, and Plaintiff's supervisor altered his review after-the-fact.[5] Ex. L at 29:18-22- 32:18.

---

[5] In the event that Fannie Mae questions whether the 2009 year end review constitutes an adverse action after the fact, it does because it affects Plaintiff's wages and benefits. The pay increase Plaintiff received in 2009 was because his position changed. Fannie Mae maintains that Plaintiff admitted that he received a salary increase in 2009 despite his Mid Year Review, and he has no facts to show that his compensation was negatively impacted by the rating. Plaintiff received an increase in salary on March 1, 2009 for his performance in 2008. Ex. A at FM134. The record contains Plaintiff's Merit Increase Statement, which confirms that the adjustment in salary was based on his FM or Fully Meets performance appraisal. *Id.* The record also contains Plaintiff's 2009 and 2010 Employee Compensation Statements which confirm that he received 0% increases in his salary in 2009 and 2010 because he received level 4—Do Not Meet Expectations—performance appraisals. Ex. A at FM133 and FM146. The adjustment to

According to Mr. Gonsalves, Plaintiff completed all of his goals and "Delivered assignments in a timely manner. Was one of the 'go to' people for support" in response to Goal 1.5, and "Continues to be an advocate, if not a champion of standards compliance. Just needs to soften his approach in communication of this advocacy" in response to Goal 1.5. Ex. L (Attachment 3) at 230-231. Plaintiff's manager described him as the "go to" person for support and an "advocate" and "champion" who completed all of his objective performance goals. Ex. L (Attachment 3) at 230-231; Ex. A. These contemporaneous statements should be given weight over Mr. Gonsalves' post hoc litigation testimony. *Ballinger v. N.C. Agric. Extension Serv.*, 815 F. 2d 1001, 1005 (4th Cir. 1987) ("[S]ince summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of a claim or defense, courts must take special care . . . because motive often is the critical issue in employment discrimination cases" (emphasis added)); *Miller v. FDIC*, 906 F. 2d 972, 974 (4th Cir. 1990) ("The rationale for this [special care] rule is that determinations of intent frequently depend upon the credibility of witnesses"); *Ross v. Commun. Satellite Corp.*, 759 F. 2d 355, 364 (4th Cir. 1985) ("Resolution of questions of intent often depends upon the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross examination").

Initially, Mr. Gonsalves rated Plaintiff on-course for every goal, but he altered Plaintiff's rating after speaking with Mr. Gonsalves' supervisor. Ex. L (Gonsalves Dep.) at 29:18-22-

---

Plaintiff's salary in 2009 was an internal adjustment by Fannie Mae due to the fact that Plaintiff received a new job title and compensation level. Ex. A at FM 132. The adjustment to Plaintiff's salary in 2009 was completely unrelated to Fannie Mae's assessment of his performance, and Plaintiff's compensation was negatively impacted as a result of the 2009 and 2010 performance reviews because he received 0% adjustments in his salary.

32:18. While Mr. Gonsalves' initial ratings are compatible with his positive comments of Plaintiff, his altered off course rating conflicts with his comments. *See* Ex. A (FM193-99).

Even compared to his peers, Mr. Gonsalves ranked above average according to Fannie Mae's own metric. *See* Ex. A. As Fannie Mae repeatedly emphasized to its employees, a rating of four or above means above average compared to peers and should be used sparingly. *See id.* However, Plaintiff still received an above average rating in all categories, and averaged a 4.28 rating from his peers and supervisor in 2010. Ex. A. Plaintiff's 4.28 peer rating in 2009 is consistent his similar ratings in 2007 and 2008. Ex. A (FM_AB113, 126) at FM106(4.66); FM113 (4.28). However, Plaintiff received a fully satisfactory rating in 2007 and 2008, and he received the lowest possible rating of do not meet expectations in 2009. *See* Ex. A (FM_AB113, 126). This logical inconsistency raises an inference of pretext.

In support of its post hoc statements that Plaintiff's above 4 rating is actually low, Defendant produced an email from December 29, 2008. FM Ex. 12. This email has **no bates number** and Plaintiff is unable to find a copy of this email in Defendant's produced documents. *See id.* Further, Defendant Fannie Mae also mischaracterizes the exhibit. *See id.* There is no indication on the email that Ms. Sembles sent the email and the email is entirely unrelated to the Accountability Survey percentile of 2009 as the email was drafted before the 2009 rating year even began. *Id.*

(d) Defendant Fannie Mae's 2010 mid-year review of Plaintiff is pretextual.

Defendant Fannie Mae does not even attempt to justify Plaintiff's 2010 mid-year review. FM Mem. at 26-29. Inexplicably, Ms. Roy rated Plaintiff for his mid-year review even though she did not supervise him during any part of the mid-year period. Ex. M at ¶ 11; Ex. L (Attachment 1). The "off-track" mid year review itself does not justify Ms. Roy's rating as the

only comment Ms. Roy made was Plaintiff "[h]as demonstrated his initiative to improve." Ex. L (Attachment 1) at 4.

(e) <u>Defendant decided Plaintiff's termination in or around December 2010 and used the remaining documentation as post hoc and pretextual justification for his termination.</u>

Plaintiff's discipline and termination after December 2010 raises an inference of pretext because Plaintiff was targeted for termination due to his discriminatory 2009 reviews. *See* Ex. C (attachment 6). In December 2010, Mr. Blundell decided to "manage…out" Plaintiff due to his reviews, even though Mr. Blundell did not have any personal knowledge regarding Plaintiff's performance. *See* Ex. C 24:7-9, 25:5-11, 33:12-18; Ex. C (attachment 6).  Mr. Blundell did not immediately terminate Plaintiff because Ms. Sember, from Fannie Mae's human resources department, requested a justification for immediate termination and noted the "normal" process for terminating an employee. Ex. C (attachment 6). Mr. Blundell made this termination decision before the 2010 year-end review was even finalized. *See id.* He then attempted to manifest documents that corresponded with Ms. Sember's described process, and the haphazard nature of the proceeding documents themselves raise an inference of pretext.

Ms. Roy's 2010 year-end review is beyond credence because she knew of Mr. Blundell's intention to terminate Plaintiff and cherry-picked available information to support his documentation request. *See* Ex. C (attachment 6); Ex. O (Attachment 7); Ex. A (FM193-99). Compare to her one-line mid-year review of Plaintiff, Ms. Roy's year-end review was far more extensive. *Compare* Ex. O (Attachment 7) *with* Ex. A (FM193-99). As part of the year-end review, Ms. Roy received commentary from Mr. Wolf who worked with Plaintiff on a critical project. Ex. O (Attachment 7). Ms. Roy mischaracterized Mr. Wolf's assessment of Plaintiff in the 2010 year-end review to support her rating. *Compare* Ex. O (Attachment 7) *with* Ex. A (FM193-99). Mr. Wolf expressly stated that his observed limitations regarding Plaintiff's

performance stemmed from Plaintiff's status as an Application Developer Analyst II and noted that his performance was consistent with that of other Application Developer Analyst II that Mr. Wolf previously worked with in other projects. Ex. O (Attachment 7). Ms. Roy did not cite Mr. Wolf's observation. Ex. A (FM193-99).

On February 10, 2011, Plaintiff Abdul-Baaqiy simultaneously received a Memorandum of Concern and a PIP, which cited to his 2009 and 2010 performance reviews. Ex. S FM431; Ex. C. While a PIP was supposed to help Plaintiff to improve, he was terminated before he had the opportunity to attempt to meet the requirements of the PIP. Ex. M ¶ 16; Ex. C (Attachment 11). On February 4, 2011, Mr. Blundell already decided to terminate Plaintiff in April 2011. Ex. B. Mr. Blundell did not bother to alter his timeline when Plaintiff had to go on STD due to his work stress. *See id.* He terminated Plaintiff in April 2011, shortly after Plaintiff returned from leave. Ex. M ¶ 16. Fannie Mae's own emails show that its justification for Plaintiff's 2010 year-end review, MOC, PIP, and termination were all pretextual and only issued to provide documentation in support of Plaintiff's predetermined termination in December 2010.

### III.   Plaintiff has demonstrated an issue of material fact regarding whether the "forced ranking" policy had a disparate impact on African-American employees.

"To establish a prima facie case of disparate impact, the plaintiff must show that [(1)] a facially neutral employment policy [(2)] has a disproportionately adverse effect on a protected class of people. *Onyewuchi v. Mayorkas*, 766 F.Supp.2d 115, 130 (D.D.C. 2011).  Once Plaintiff has established a prima facie case, Defendant must "demonstrate either that the challenged employment practices do not cause a disparate impact or that they are job-related and justified by business necessity." *Menoken v. Whipple*, 605 F.Supp.2d 148, 153 (D.D.C. 2009); 42 U.S.C. § 2000e–2(k)(1)(A)(i). Finally, if the defendant demonstrates business necessity, Plaintiff "must be given an opportunity to demonstrate that an alternative employment practice could meet the

employer's legitimate needs without a similar discriminatory effect."  *Id.*; 42 U.S.C. § 2000e–2(k)(1)(A)(ii).

Defendant Fannie Mae argues that it is entitled to summary judgment on Plaintiff's claims of disparate impact under Section 1981 and the DCHRA because Plaintiff has not identified a specific employment practice that had a disparate impact on African Americans and has not provided evidence establishing that this employment practice resulted in adverse actions against employees because they were African American.  MSJ Mem. at 21-26.  Defendant's motion should be denied because Plaintiff has demonstrated that Fannie Mae established a forced ranking policy in December 2008 that continued through at least the end of 2010 and this policy caused a disproportionate number of African Americans to receive performance reviews which rated their performance as "do not meet expectations," resulting in adverse employment actions against African Americans, including Plaintiff when he was terminated in April 2011 due to his lowered performance evaluations resulting from the forced ranking policy. In addition, Fannie Mae has entirely failed to establish that the forced ranking policy was "job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e–2(k)(1)(A)(i).

(a) Plaintiff has identified Fannie Mae's forced ranking policy as the an unlawful employment practice causing a disparate impact on African American employees at Fannie Mae.

Defendants make the puzzling argument that Plaintiff has not identified a specific employment practice behind his disparate impact claim, despite the fact that Plaintiff has consistently maintained that Fannie Mae's forced ranking policy had a disparate impact on African American employees at Fannie Mae.  *See* MSJ Mem. at 23-25.  Defendants also provide the entirely unsupported assertion that "a reliance on subjective employment decisions" is not sufficient to form the basis for an employment practice.  MSJ Mem. at 23.  This is a false

statement of the law as "[t]he disparate impact analysis has been applied in the context of subjective employment criteria as well as objective or standardized tests." *Prince v. Rice*, 453 F.Supp.2d 14, 27 (D.D.C. 2006).  Regardless, the forced ranking policy cannot be said to be a "subjective employment decision," and Fannie Mae has not even attempted to make that argument.

Next, Fannie Mae claims that Plaintiff is required to explain *how* the forced ranking policy resulted in racially disparate outcomes.  *Id.*  This is also incorrect as a matter of law.  A "disparate impact claim exists when an employment practice, though neutral on its face in its treatment of different groups, falls more harshly on one group than another." *Hyman v. First Union Corp.*, 980 F.Supp. 38, 40 (D.D.C. 1997).  "Unlike a disparate treatment claim, plaintiffs asserting a disparate impact claim need not establish a discriminatory motive on the part of the employer." *Id.*  In other words, while disparate treatment claims require a plaintiff to show *how* an adverse action was taken as a result of intentional discrimination based on a protected category, the purpose of disparate impact claims is to enable plaintiffs to establish discrimination in the absence of such a showing, where there was a policy that, though facially neutral, resulted disproportionately affected a protected class in a negative way.  Further, Fannie Mae's citation to *Ross v. Lockheed Martin Corp.* is taken out of context, and the plaintiffs in that case only generally represented that the companywide evaluation procedures were "flawed," "resulted in ratings that were poorly correlated with job performance," and were "biased" without identifying what specific practice or policy in evaluation procedures caused a racially disparate impact.  No. 16-CV-2508, at *38 (D.D.C. July 28, 2017).  Here, Plaintiff has specifically identified the forced ranking policy as the cause of African American employees at Fannie Mae receiving

disproportionately lower performance ratings, which impacted their ability to succeed at Fannie Mae, including by causing Plaintiff's termination.

Even assuming, *arguendo*, that Plaintiff had to provide an explanation for how the forced ranking policy adversely impacted African American employees, he has easily done so. A former Director at Fannie Mae from 1997 through 2013, Beverly Everson-Jones, explained how the forced ranking policy had an adverse impact on African American employees in her deposition. First, she explained how "ratings [were] based upon people's assignments" and individuals with "highly visible," "highly resourced" assignments would likely receive higher ratings than those who received "very demanding, very dirty" assignments "with limited resources," independent of how hard the individuals worked on their assignments, G at 123, and she observed that non-minorities received higher resourced assignments, such as a highly resourced risk appetite assignment, *id.* at 124-25. While she was only asked about the specifics of discriminatory behavior by one supervisor, *id.* at 123-25, she testified that she believed at least four managers made such decisions based on race, *id.* at 122. Next, Ms. Everson-Jones described how the forced ranking system had an adverse impact on minorities because "before [] [] the forced ranking system [managers] had more latitude to be able to rate people on a level playing field" and the forced ranking system required managers to "search[] for people [] [] [to] put in these buckets." *Id.* at 125. In other words, before the forced ranking system, someone "could have still gotten a meets expectation or whatever the equivalent of it was because no one was going to force that there be 20 percent." *Id.* at 126. Essentially, Ms. Everson-Jones described how the forced ranking system amplified existing biases by forcing managers to rate a certain percentage of employees, who may have had successful performance, but were on less visible projects, as unsatisfactory.

Ms. Everson-Jones also explained how lowered performance ratings made African American employees more likely to experience subsequent adverse employment actions. An employee's midyear review influenced the employee's year-end review, and an employee who was rated off-track in their midyear review would have to establish a pattern of positive change in performance to improve their year-end review. *Id.* at 85, 86. In addition, she observed that non-African American employees who were rated off-track in their midyear performance reviews were more likely to receive coaching and be taken under someone's wing to help them improve. *Id.* at 127-28. In contrast, African American employees who were rated off-track in their midyear performance reviews were less likely to receive coaching. *Id.* at 130. Importantly, she explained how the forced ranking policy ultimately caused a disproportionate number of African Americans to be terminated because managers would look to individuals who had received lower performance evaluations when they had to eliminate jobs, even if the individuals terminated were meeting the expectations of their positions. *Id.* at 154-56. She further observed that over time, the number of directors and officers in operations and technologies who were African American decreased, and she knew a number of African American directors, including herself, who were terminated. *Id.* at 155-56.

Defendant falsely suggests that all evidence regarding Plaintiff's termination establishes that his termination was unrelated to his 2009 and 2010 performance reviews, which he contends were poor as a result of Fannie Mae's forced ranking policy. In fact, Mr. Blundell acknowledged that Plaintiff's 2009 midyear review was a factor in his termination, Ex. C at 26:5-15, and that he

had decided to "manage out" Plaintiff before Plaintiff even received his 2010 year end performance review, *id.* at 90:19-21.[6]

    (b) <u>Plaintiff has shown that Fannie Mae's forced ranking policy had a disproportionately adverse effect on African American employees.</u>

Defendant argues that Plaintiff has not met his burden of providing statistical evidence showing African American were disproportionately affected by Fannie Mae's forced ranking policy. Plaintiff has absolutely established that the forced ranking policy had "a disproportionately adverse effect" on African American employees at Fannie Mae. *Onyewuchi*, 766 F.Supp.2d at 130.

On March 27, 2017, in response to a court order, Defendant finally produced an anonymized list setting forth an employee identification number with the position, race, and year-end performance rating for each non-manager, non-director employee in the MHA Program for 2007 through 2010. Ex. T. This data shows that in 2007, prior to the implementation of the forced ranking policy, and African American and Caucasian employees received substantially the same percentage of the lowest performance ratings (FM): 58.3% of African American employees received an FM performance rating and 54.3% of Caucasian employees received an FM performance rating. Ex. U. Fannie Mae announced the mandatory forced ranking system in December 2008. Def.'s MSJ Ex. 1; Def.'s Ex. Semper Decl. at ¶ 4. However, the policy did not go into effect as a practical matter until after the year-end 2008 performance evaluations.

---

[6] Defendant also argues, as an aside, that Plaintiff's performance reviews are time barred per the court's previous order. In making this assertion, Defendant misconstrues the court's prior order, as well as legal standard. Here, "the plaintiff must show that a facially neutral employment policy has a disproportionately adverse effect on a protected class of people. *Onyewuchi v. Mayorkas*, 766 F.Supp.2d 115, 130 (D.D.C. 2011). The adverse effect that Mr. Abdul-Baaqiy experienced as a result of the performance rating policy was his termination in April 2011. The statute of limitations did not begin to run until Mr. Abdul-Baaqiy experienced harm as a result of the discriminatory performance rating policy, namely, his termination.

Compare Ex. A at FM000122-125 (Plaintiff's 2008 performance evaluation, which does not contain any language about Plaintiff's performance "relative to his peers"), *with* Ex. A at FM000135-139 (Plaintiff's 2009 Mid Year Review, containing extensive language indicating that his performance rating was "relative to his peers," including noting for plaintiff's goal that his manager should "consider relativity of your employee's performance to his/her peers," *id.* at FM000135, and soliciting comments "relative to peers" and "relativity to his/her peers." *id.* at FM000138), *and* Ex. A at FM000140-145 (Plaintiff's 2009 End Year Review, containing language indicating that his performance rating was "relative to his peers," including soliciting comments "relative to peers," *id.* at FM000144). Because the forced performance rating had not been implemented as a practical matter at the time the 2008 year-end evaluations were issued, African American and Caucasian employees continued to receive substantially the same percentage of the lowest performance ratings (FM-) in their 2008 year-end performance evaluations. However, in 2009, following the implementation of the forced ranking policy, African Americans employee comprised a significantly increased number of the lowest performance ratings. Ex. U. Specifically in 2009, 15.2% of African Americans received level 4 or "Do Not Meet Expectations" performance ratings, while only 6.9% of Caucasians received level 4 ratings. *Id.*; see also Exhibit P (ATTACHMENT 4) (FM_AB17). By the following year, 80.0% of African Americans received level 3 or level 4 performance ratings, while only 67.8% of Caucasians received level 3 or level 4 performance ratings. Ex. U.

Ms. Everson-Jones confirmed that the forced ranking policy disproportionately impacted minorities in her department. She testified that she remembered a number of instances in which minority employees' performance ratings were downgraded due to the forced ranking system and while African Americans comprised only ten to twenty percent of the employees in her

department, forty percent of employees who received lower rankings were African Americans. Ex. G at 111:20-121:23.  As a result, a disproportionate number of African Americans were terminated because managers would look to individuals who had received lower performance evaluations when they had to eliminate jobs, even if the individuals terminated were meeting the expectations of their positions, and "a lot of minorities [were] laid off during the years from probably 2009 through 2013," and African American in particular.  *Id.* at 64-65, 154-56.  She observed that over time, the number of directors and officers in operations and technologies who were African American decreased, and eventually she became the "only African-American woman in [her] department as a director," until she was terminated in 2013.  *Id.* at 66, 155-56.

   (c) <u>Plaintiff has shown that Fannie Mae's forced ranking policy is not consistent with business necessity.</u>

     Defendant argues that numerous "companies across the board" uses the forced ranking system, and Defendant needed to institute the system as a response to the housing crisis. FM Mem. at 25-26. First, Defendant mischaracterizes its performance rating system. *See id.* Defendant Fannie Mae always had a 360 review process that accounted for the feedback of multiple stakeholders, such as managers and coworkers, in an employee's review. Ex. P at 14:9-18; *see also* Ex. A (FM_AB113, 126). The critical change from 2008 to present was the comparison of an employee to his peers and forcing a certain percentage of employees to be in the bottom performance review ranking even though Fannie Mae recognizes that the employee may satisfy one hundred percent of the goals it initially set with the employee. *See* EX. I (FM_AB345).; Ex. P (Attachment 2) ; Ex. A.  Defendant Fannie Mae has not even listed another company that categorical fits a percentage of its employees into the lowest rating system with consequences to their employment benefits irrespective of the employee's performance relative to his own goals.

Second, Defendant Fannie Mae's response and continual use of the forced ranking system is irrational as Fannie Mae would be reducing the already "tiny number of qualified individuals" who would be able to help Fannie Mae address the economic downturn. FM278. Further, Defendant would need to allocate its already limited resources due to the housing crisis to transiting and training new staff members, who may need years to adjust and succeed in Fannie Mae's particular system. *See id.*

## Conclusion

For the reasons set forth above, Plaintiff Saddiq Abdul-Baaqiy respectfully requests the Court deny Defendant Fannie Mae's Motion for Summary Judgment.

Date:   January 19, 2018                          Respectfully Submitted,
                                                  _____/s/_____
                                                  David A. Branch, DC Bar # 22862
                                                  Law Office of David A. Branch &
                                                  Associates, PLLC
                                                  1828 L Street, NW, Suite 820
                                                  Washington, D.C. 20036
                                                  202.785.2805 phone
                                                  202.785.0289 fax
                                                  davidbranch@dbranchlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of January 2018, I caused a copy of the foregoing to

be served electronically on counsel for the Defendant listed below:


Damien G. Stewart
Associate General Counsel
Fannie Mae
3900 Wisconsin Avenue, NW
Washington, D.C. 20016
(202) 752-6871 (tel)
(202) 997-7405 (fax)
damien_g_stewart@fanniemae.com

Wendy M. Lazerson
wlazerson@sidley.com
Y. Angela Lam
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, California 94304
Telephone: (650) 565-7000
Facsimile: (650) 565-7100

Frank R. Volpe
fvolpe@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711


*/s/ David A. Branch*
David A. Branch