# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>SADDIQ ABDUL-BAAQIY,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No. 15-450 (RMC)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION,</td><td>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OPINION

Saddiq Abdul-Baaqiy brought this case against the Federal National Mortgage Association (Fannie Mae) for race discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act (DCHRA), D.C. Code Ann. § 2-1401 *et seq*. After a very lengthy and contentious discovery period, Fannie Mae moved for summary judgment on all claims. Despite the extended discovery, the Court finds that Mr. Abdul-Baaqiy has failed to locate and put forth sufficient facts and statistical evidence to survive the motion.

## I. BACKGROUND

### A. Undisputed Material Facts

At summary judgment, the Court may only consider undisputed material facts. As they did during discovery, the parties have thoroughly litigated the question of undisputed facts.[1] Having reviewed the proposed undisputed facts submitted by Fannie Mae and Mr. Abdul-

---

[1] *See* Def. Fannie Mae's Statement of Material Facts as to Which There is No Genuine Issue in Supp. of Its Mot. for Summ. J. (Fannie Mae SOF) [Dkt. 54-30]; Pl.'s Statement of Disputed Material Facts in Supp. of His Mem. of P. & A. in Opp'n to Def. Fannie Mae's Mot. for Summ. J. (Abdul-Baaqiy SOF) [Dkt. 55-22]; Def. Fannie Mae's Resp. Pl.'s Statement of Disputed Material Facts in Supp. of Def.'s Mot. for Summ. J. [Dkt. 56-3].

Baaqiy's objections, the Court finds that the following facts are undisputed and relevant to the underlying claims:[2]

1. Mr. Abdul-Baaqiy is an African-American male. Am. Compl. [Dkt. 13] ¶ 3.

2. Mr. Abdul-Baaqiy worked for Fannie Mae for approximately ten years from 2001 until his termination in April 2011. *See* Fannie Mae SOF ¶ 1; Abdul-Baaqiy SOF ¶ 1.

3. Mr. Abdul-Baaqiy received his last performance appraisal in February 2011, which covered his employment for year-end 2010. *See* Fannie Mae SOF ¶ 3; Abdul-Baaqiy SOF ¶ 3; *see also* Ex. 8, Decl. of Cheryl Sember in Supp. of Def. Fannie Mae's Mot. for Summ. J. (Sember Decl.) [Dkt. 54-16], Abdul-Baaqiy 2010 Year-End Eval. [Dkt. 54-24].

4. In December 2008, Fannie Mae announced changes to its performance management process, which included a mandatory rating curve requiring that managers evaluate employees not just against their individual goals, but also against the performance of their peers. Ex. 1, Sember Decl., Herb's Friday message Dec. 12 2008 [Dkt. 54-17]; *see also* Ex. D, Decl. of Wendy Lazerson in Supp. of Def. Fannie Mae's Mot. for Summ. J. (Lazerson Decl.) [Dkt. 54-2], Jan. 2014 Abdul-Baaqiy Dep. (Abdul-Baaqiy Dep.) [Dkt. 54-6] at 31-36. The new policy went into effect for the 2008 year-end evaluations. *See*

---

[2] The Court notes that Plaintiff has the burden to demonstrate a dispute of material fact by citing contrary, admissible evidence. *See* LCvR 7(h)(1) ("An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."). It is not the Court's burden to dig through the entirety of the record to determine if any contrary evidence exists. *See Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) ("[A] district court should not be obligated to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact."). To the extent Mr. Abdul-Baaqiy did not cite specific facts in the record that raise a material question of fact, the facts proposed by Fannie Mae are conceded.

Herb's Friday message; Abdul-Baaqiy Dep. at 36. In addition, the policy required managers to rate at least 20% of peer employees within each division as "Fully Meets Minus"—the lowest overall performance rating. *See* Herb's Friday message; Sember Decl. ¶ 4.

5. The updated policy with the mandatory 20% requirement was in effect for the 2008 year-end and 2009 mid-year evaluations. Sember Decl. ¶ 6.

6. In September 2009, the policy was revised again, this time to direct that 5-10% of employees should fall in the "4 – Do Not Meet Expectations" category—the lowest tier. *See* Ex. 2, Sember Decl., Mike Williams Message to Employees [Dkt. 54-18]; Abdul-Baaqiy Dep. at 54-55. This 2009 policy for distribution of employee ratings among evaluation tiers was a "guidance, not a mandate." Mike Williams Message to Employees at FM_AB000196.

7. Mr. Abdul-Baaqiy received a "Fully Meets" (FM) rating in his 2008 year-end evaluation. Ex. 5, Sember Decl., Abdul-Baaqiy 2008 Year-End Eval. [Dkt. 54-21] at FM_AB000484.

8. However, he was rated "Off-Track" in his 2009 mid-year evaluation. Ex. 6, Sember Decl., Abdul-Baaqiy 2009 Mid-Year Eval. [Dkt. 54-22] at FM_AB000498.

9. Mr. Steven Gonsalves conducted Mr. Abdul-Baaqiy's 2009 mid-year review. Ex. L, Pl.'s Mem. of P. & A. in Opp'n to Def. Fannie Mae's Mot. for Summ. J. (Opp'n) [Dkt. 55], Dep. of Steven Gonsalves (Gonsalves Dep.) [Dkt. 55-12] at 14. Mr. Gonsalves testified that he rated Mr. Abdul-Baaqiy "Off Track" because Mr. Abdul-Baaqiy "alienated the rest of the team," "over sold himself, saying he could handle an assignment," and "did not utilize the contractors and his results were not usable." *Id*. at 14-15.

10. For 2009 mid-year evaluations, Mr. Gonsalves had been instructed to rate the lowest six performers on his team as "Off Track" to comply with the 20% policy, but not all those six individuals received such low ratings "because of their performance against goals." *Id*. at Ex. 1 (FM000561-62). Mr. Abdul-Baaqiy was on the list of the lowest six performers. *See id*.

11. In his year-end evaluations for both 2009 and 2010, Mr. Abdul-Baaqiy received the same rating of "4 – Do Not Meet Expectations." Ex. 7, Sember Decl., Abdul-Baaqiy 2009 Year-End Eval. [Dkt. 54-23] at FM_AB000504; Ex. 8, Sember Decl., Abdul-Baaqiy 2010 Year-End Eval. [Dkt. 54-24] at FM_AB000789.

12. Mr. Gonsalves also issued Mr. Abdul-Baaqiy's 2009 year-end review and testified that Mr. Abdul-Baaqiy received the lowest rating because he was "the poorest performer on [Mr. Gonsalves'] team." Ex. A, Lazerson Decl., Hearing Tr. [Dkt. 54-3] at 27.

13. Ms. Sarbari Roy completed Mr. Abdul-Baaqiy's 2010 year-end evaluation and testified that Mr. Abdul-Baaqiy received the lowest rating from her because he "was not performing as per expectations on several of his goals and there was [sic] gaps in his performance." Hearing Tr. at 108; *see also id*. at 109-10 ("There was deficiency in the way he performed his duties as in he took more time than necessary to come up to speed and there was [sic] gaps in his understanding of the system and the design and implementation of it.").

14. Mr. Abdul-Baaqiy also received feedback on his performance in 2009 and 2010 from his managers and peers, which included both positive and negative comments. *See* Ex. 10, Sember Decl., 2009 Accountability Survey for Saddiq Abdul-Baaqiy [Dkt. 54-26] at FM_AB000490-91; Ex. 11, Sember Decl., 2010 Gathering Feedback for Associates for

Saddiq Abdul-Baaqiy [Dkt. 54-27]. In Mr. Abdul-Baaqiy's 2009 Accountability Survey he received an overall ranking of 4.39, *see* Accountability Survey for Saddiq Abdul-Baaqiy at FM_AB000486, which put Mr. Abdul-Baaqiy in the bottom 25% of individuals rated by the Accountability Survey. *See* Ex. 12, Sember Decl., HR Communications Email [Dkt. 54-28] (noting that a score of 4.57 would put an employee that is a "Level 1-5 Individual Contributor[]" in the 25th percentile).

15. In April 2011, Malcolm Blundell, then Director of the Making Home Affordable program, terminated Mr. Abdul-Baaqiy's employment. *See* Am. Compl. ¶ 20; Answer [Dkt. 14] ¶ 20; *see also* Ex. C, Opp'n, Dep. of Malcolm J. Blundell (Blundell Dep.) [Dkt. 55-3] at 73. Mr. Blundell testified that he terminated Mr. Abdul-Baaqiy because he had received a poor year-end review for two years (2009 and 2010) and had failed to improve. Blundell Dep. at 72-73, 78-79.

### B. Other Relevant Facts

Mr. Abdul-Baaqiy stated, for the first time in his August 1, 2017 amended responses to special interrogatory number 14, that in or around early 2010, Mr. Gonsalves referred to him as "boy." Ex. M, Lazerson Decl., Pl.'s Am. Resps. to Special Interrog. No. 14 [Dkt. 54-15] at 5. Fannie Mae disputes this statement and provides a declaration from Mr. Gonsalves stating that he has no recollection of ever referring to Mr. Abdul-Baaqiy as "boy" and would not use that term to refer to an individual due to its derogatory meaning. Decl. of Steven Gonsalves in Supp. of Def. Fannie Mae's Mot. for Summ. J. [Dkt. 54-29] ¶ 4. However, Fannie Mae also argues in its motion for summary judgment that even accepting Mr. Abdul-Baaqiy's recollection as true, summary judgment is still appropriately granted in Fannie Mae's favor.

The parties also dispute the extent to which Mr. Abdul-Baaqiy has provided statistical evidence necessary to demonstrate a discriminatory disparate impact due to his race.

Mr. Abdul-Baaqiy submitted two exhibits with his opposition to Fannie Mae's motion for summary judgment, which he argues demonstrate disparate impact. *See* Ex. T, Opp'n, Abdul-Baaqiy Data [Dkt. 55-20]; Ex. U, Opp'n, Abdul-Baaqiy Statistical Analysis [Dkt. 55-21]. Fannie Mae accurately points out that Mr. Abdul-Baaqiy did not provide notice of the retention of an expert or serve any expert reports on Fannie Mae.

### C. Procedural History

Plaintiff's Amended Complaint included both individual and potential class claims of race discrimination under § 1981 and the DCHRA. *See* Am. Compl. This Court previously granted summary judgment to Fannie Mae on Mr. Abdul-Baaqiy's claim of disparate treatment under the DCHRA, except as it might relate to his termination. All other allegedly discriminatory acts were outside the relevant DCHRA statute of limitations. *See Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*, 149 F. Supp. 3d 1 (D.D.C. 2015) (*Abdul-Baaqiy I*). The following claims remain:

> Disparate treatment under § 1981 as to all alleged discriminatory acts;
>
> Disparate treatment under the DCHRA as to Mr. Abdul-Baaqiy's termination; and
>
> Disparate impact of the forced-ranking policy under the DCHRA (as it relates to Mr. Abdul-Baaqiy's termination).

Fannie Mae's motion for summary judgment is ripe for review. [3]

## II.  LEGAL STANDARD

### A. Summary Judgment – Federal Rule of Civil Procedure 56

---

[3] Def. Fannie Mae's Notice of Mot. and Mot. for Summ. J. [Dkt. 54]; Statement of P. & A. in Supp. of Def. Fannie Mae's Mot. for Summ. J. (Mem.) [Dkt. 54-1]; Opp'n; Def. Fannie Mae's Reply to Pl. Saddiq Abdul-Baaqiy's Opp'n to Fannie Mae's Mot. for Summ. J. (Reply) [Dkt. 56].

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, a court gives the non-movant the benefit of all permissible inferences that may be drawn from the facts alleged in the complaint and accepts the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255; *Talavera*, 638 F.3d at 308. A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## B. Section 1981 and DCHRA – Disparate Treatment

Section 1981(b), part of the Civil Rights Act of 1866, "prohibits racial discrimination in the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Carney v. American Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998) (quoting 42 U.S.C. § 1981(b)). The DCHRA prohibits an employer from failing or refusing to hire, discharging, or otherwise discriminating "against any individual, with respect to his compensation, terms,

conditions, or privileges of employment" "based upon the actual or perceived: race, color, religion, national origin, sex, age . . . of [the] individual." D.C. Code § 2-1402.11(a).[4]

If a plaintiff cannot provide direct evidence of discrimination, courts apply the burden-shifting framework established long ago in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[5] As described by the Supreme Court, the *McDonnell Douglas* framework applies as follows: A plaintiff must first make out a prima facie case (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Id.*; *see Youssef v. FBI*, 687 F.3d 397, 401-02 (D.C. Cir. 2012). "If the plaintiff satisfies h[is] prima facie case, then the employer must 'produce admissible evidence that, if believed, would establish that its action was motivated by a legitimate, nondiscriminatory reason.'" *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004)).

At that point, the burden-shifting framework ends and a court must review all the evidence to determine whether a reasonable jury could infer intentional discrimination. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008). The Court considers: "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of

---

[4] The same standards that govern § 1981 discrimination claims govern the DCHRA. *See Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1301-02 (D.C. 1994).

[5] The *McDonnell Douglas* framework applies to § 1981 claims. *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1988) (applying framework to § 1981 claims).

discriminatory statements or attitudes on the part of the employer).” *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)) (internal quotation marks omitted).

## C. DCHRA – Disparate Impact

DC Code § 2-1402.68 prohibits “[a]ny practice which has the effect or consequence of violating any of the provisions of [the District of Columbia Human Rights Act].” That clause is known as the “effects clause” and practices are unlawful under it “despite the absence of any intention to discriminate, . . . if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason.” *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987); *see also 2922 Sherman Ave. Tenants’ Ass’n v. District of Columbia*, 444 F.3d 673, 685 (D.C. Cir. 2006) (adopting D.C. Court of Appeals’ interpretation of DCHRA).

“The DCHRA’s effects clause is modeled on the federal disparate-impact doctrine that arose out of *Griggs v. Duke Power Co.*, 401 U.S. 424 . . . (1971).” *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 157 (D.D.C. 2014). The federal disparate-impact doctrine prohibits “practices” or “policies” that have the effect of discriminating against a protected group of people. A burden-shifting analysis, similar to *McDonnell Douglas*, is employed.

“A *prima facie* case of disparate impact requires the identification of a specific employment practice that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of individuals.” *Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013); *see also Ricci v. DeStefano*, 557 U.S. 557, 576-78 (2009). Disparate impact claims also require demonstration of causation through “statistical evidence of a kind and degree sufficient to show that the practice in question . . . caused” individuals to suffer the offending adverse impact “because of their membership in a protected group.” *Watson v. Fort Worth Bank &*

*Trust*, 487 U.S. 977, 994 (1988) (plurality opinion); *see also Ricci*, 557 U.S. at 587 (noting that a prima facie of disparate impact requires, "essentially, a threshold showing of a significant statistical disparity") (citing *Connecticut v. Teal*, 457 U.S. 440, 446 (1982)).

If a plaintiff makes out a prima facie case, the burden shifts to the defendant to demonstrate that the challenged employment practices do not cause a disparate impact or that the challenged employment practices are justified by business necessity. *Onyewuchi v. Mayorkas*, 766 F. Supp. 2d 115, 131 (D.D.C. 2011). "To maintain an employment requirement with a disparate impact, 'Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.'" *Smith v. Henderson*, 944 F. Supp. 2d 89, 107 (D.D.C. 2013) (quoting *Griggs*, 401 U.S. at 432); *see also Gay Rights*, 536 A.2d at 29 (holding that the employer must demonstrate the employment practice is "independently justified for some nondiscriminatory reason").

Should a defendant demonstrate business necessity, the burden shifts back to the plaintiff to show that an alternative employment practice could legitimately meet the employer's needs without a similar discriminatory effect. *Onyewuchi*, 766 F. Supp. 2d at 131 (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii)).

### III. ANALYSIS

#### A. Disparate Impact

The DCHRA only permits claims related to discriminatory acts taken one year before the case is filed. *See* D.C. Code § 2-1403.16 (noting the statute of limitations runs from when the plaintiff discovered or reasonably should have discovered the discriminatory act). Because Mr. Abdul-Baaqiy's lawsuit was filed in March 2012, only claims related to allegedly discriminatory actions that took place in March 2011 or later may be remedied. Therefore, only his termination in April 2011 is relevant. As a result, Mr. Abdul-Baaqiy's disparate impact claim

must relate to his termination, as the Court previously held in ruling on Fannie Mae's Motion to Dismiss, and in the alternative, for Summary Judgment. *See Abdul-Baaqiy I*, 149 F. Supp. 3d at 8-9. Therefore, if Mr. Abdul-Baaqiy intends to use evidence regarding the alleged disparate impact resulting from the forced-ranking policy, he must demonstrate that disparate impact in the forced-ranking policy also created a disparate impact in terminations of African-American employees.

Mr. Abdul-Baaqiy does not attempt to show a disparate impact on African-American terminations resulting from the forced-ranking policies. Instead, he specifically argues that he challenges the forced-ranking policy and presents only statistical evidence that is intended to show disparate impact from the forced-ranking evaluation process. Unfortunately, Mr. Abdul-Baaqiy did not bring this case within one year of his being subject to the forced-ranking policy; therefore, as the Court previously found, his argument related to the ranking policy is irrelevant unless he can tie it to a disparate impact in termination, which he does not. The only evidence Mr. Abdul-Baaqiy provides that even references an impact on terminations is the deposition of Ms. Beverly Everson-Jones, who states that "a lot of minorities . . . got laid off during the years from probably 2009 through 2013." Ex. G, Opp'n, Dep. of Beverly Lynn Everson-Jones [Dkt. 55-7] at 64. This statement alone does not demonstrate a disparate impact in terminations after poor evaluations under the forced-ranking policy. Thus, the Court will grant summary judgment to Fannie Mae on Mr. Abdul-Baaqiy's disparate-impact claim.

However, to the extent Mr. Abdul-Baaqiy is attempting to use evidence of a disparate impact in the forced-ranking policy (about which a standalone claim cannot survive the statute of limitations analysis) to support his disparate-treatment claim, the Court will evaluate the evidence submitted.

*1. Admissibility of Mr. Abdul-Baaqiy's Statistical Evidence*

Fannie Mae asserts that Mr. Abdul-Baaqiy has offered no admissible evidence showing a statistically significant impact of the forced-ranking policy on African Americans. Mr. Abdul-Baaqiy argues that the evidence provided sufficiently shows that African Americans were disproportionately impacted by the forced-ranking system.

Mr. Abdul-Baaqiy submits Exhibits T & U as the underlying data and statistical evidence showing a disparity between the treatment of white and African-American employees. Exhibit T appears to be employee data from Fannie Mae that shows the race and ratings of each employee for 2007 through 2010. *See* Ex. T, Abdul-Baaqiy Data. Exhibit U appears to be an analysis conducted using the data provided in Exhibit T. It shows the percentage of employees for 2007 through 2010 who are white versus "[b]lack/AA" and shows the distribution of ratings for each category of employees. *See* Ex. U, Abdul-Baaqiy Statistical Analysis. Exhibit U does not describe the calculations and provides no explanation of the meaning of the resulting numbers. Additionally, Mr. Abdul-Baaqiy has not provided information about the provenance of Exhibit U. Fannie Mae and the Court have no way of knowing who performed the calculations or who, if anyone, could testify about the results if the case proceeded to trial. Fannie Mae argues that Exhibit U is inadmissible because it was not "authenticated by and attached to an affidavit made on personal knowledge, setting forth such facts as would be admissible in evidence or a deposition." Reply at 10 (quoting *Stuart v. Gen. Motors. Corp.*, 217 F.3d 621, 636 n.20 (8th Cir. 2000)) (internal quotation marks omitted). The District of Columbia Circuit has held, however, that "[t]o survive summary judgment the non-moving party must 'produce evidence *capable* of being converted into admissible evidence.'" *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)) (emphasis added); *see also Celotex Corp.*, 477 U.S. at 324; Fed. R.

Civ. P. 56(e). While Mr. Abdul-Baaqiy has not explained how Exhibit U may be "capable of being converted into admissible evidence," for these purposes, the Court will assume it may ultimately be admissible if the case proceeded to trial.

2. *Reliability of Mr. Abdul-Baaqiy's Statistical Evidence*

Fannie Mae argues Exhibit U is not accurate or reliable and does not provide sufficient statistical analysis to allow a reasonable jury to find a disparate impact from the forced-ranking policy on African-American employees.

As to accuracy, the Court does not assume that Mr. Abdul-Baaqiy's calculations are accurate. *Watson*, 487 U.S. at 996. Fannie Mae impeaches the accuracy of Mr. Abdul-Baaqiy's statistical evidence by attempting to recreate his calculations and pointing to numerous errors. *See* Reply at 9 n.8. Its argument diminishes the weight of Exhibit U and calls into question whether it could be sufficiently explained to support a claim of disparate impact from forced rankings in evaluations that might further support Mr. Abdul-Baaqiy's disparate-treatment claims relating to his evaluations and termination. The Court must also consider whether, even if accurate, the evidence shows a true impact.

To establish causation, the plaintiff must offer statistical evidence which must "at a minimum, allege *some* statistical disparity, however elementary." *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004) (emphasis in original). The Supreme Court has stated:

> [T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.

*Watson*, 487 U.S. at 994-95; *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) (noting that "[a] robust causality requirement . . .

protects defendants from being held liable for racial disparities they did not create"). Mr. Abdul-Baaqiy must demonstrate that any disparity between races is not the result of mere chance. *See Ricci*, 557 U.S. 557.

There is not a single test to demonstrate disparate impact. *See Palmer v. Shultz*, 815 F.2d 84, 92 (D.C. Cir. 1987). In Title VII disparate impact cases, plaintiffs commonly demonstrate causation by presenting evidence that the disparity in outcomes between white and minority candidates is "statistically significant," meaning that statistical analysis reflects that the odds of the disparity occurring by mere coincidence are less than 5%. *Id*. One demonstrates this through a determination that the "p-value," which stands for "probability," is less than .05, meaning that the probability of a result occurring by chance is less than 5%. *Id*.

The statistical measure of "standard deviation," is another way to show this same mathematical calculation, which measures the degree to which a set of data is dispersed. *Id*. Sometimes plaintiffs use a standard deviation analysis to account for the statistical significance of disparities between employees of different races. *Anderson v. Zubieta*, 180 F.3d 329, 339-340 (D.C. Cir. 1999) (determining that a standard deviation of 1.96 or higher established a level of statistical significance appropriate for a prima facie care of disparate impact).

Parties who allege disparate impact will also occasionally rely on what is known as the "four-fifths rule," laid out in the Uniform Guidelines on Employee Selection Procedures, which is a non-binding set of guidelines penned by the Equal Employment Opportunity Commission to help employers comply with Title VII. The crux of the "four-fifths rule" is that a selection rate for any racial group that is less than four-fifths (80%) of the rate of the group with the highest selection rate is demonstrative of adverse impact. *See* 29 C.F.R. § 1607.4(D).

Regardless of the method of analysis used, a plaintiff must provide statistical evidence showing that members of a protected class would be disadvantaged by the alleged policy. *Ramseur v. Perez,* 80 F. Supp. 3d 58, 77 (D.D.C. 2015). Causation will not be proved by "small or incomplete data sets and inadequate statistical techniques." *Watson*, 487 U.S. at 996-97.

While the D.C. Circuit may be more relaxed than other circuit courts when judging the admissibility of documents at summary judgment, the fact remains that Exhibit U has an unidentified author, contains various mathematical errors, and is unexplained by its author. Its reliability is inherently suspect. *Compare Greer*, 505 F.3d at 1315 ("To survive summary judgment the non-moving party must produce evidence capable of being converted into admissible evidence.") *with Stuart*, 217 F.3d at 636 n.20 ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).") *and Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). Yet Mr. Abdul-Baaqiy relies upon Exhibit U. The analysis in Exhibit U is flawed and simplistic, providing only a rudimentary assessment of the forced-ranking policy without explanation or clear results. Indeed, Fannie Mae identified inaccuracies in the calculations. The isolated percentages reflected in Exhibit U provide no context and constitute "inadequate statistical techniques," *Watson*, 487 U.S. at 996-97, to indicate reliably the significance of Fannie Mae's forced-ranking policy.

Because Exhibit U is insufficient to demonstrate a racial disparity resulting from the forced-ranking policy, it also is insufficient to support Mr. Abdul-Baaqiy's claim that his low evaluation ratings and discharge were a result of disparate treatment.

### B. Disparate Treatment

Because the standards to evaluate a disparate-treatment claim are the same under § 1981 and the DCHRA, the Court will consider both claims together.

Fannie Mae argues that Mr. Abdul-Baaqiy has not provided sufficient evidence to rebut Fannie Mae's legitimate non-discriminatory reasons for giving Mr. Abdul-Baaqiy low evaluation ratings and terminating his employment, namely that Mr. Abdul-Baaqiy was not performing at the expected level of competency in his position and had not demonstrated improvement from one year to another. Mr. Abdul-Baaqiy responds that Fannie Mae's reason is pretextual because the evidence does not support a finding that his performance was sub-par. Mr. Abdul-Baaqiy argues that he received positive feedback from his peers and he believes he was given low ratings on his 2009 and 2010 year-end evaluations only because the policies in effect required some percentage of employees to be rated as the least performing, that is, in the lowest tier. Additionally, Mr. Abdul-Baaqiy argues that his supervisor, Mr. Gonsalves, referred to him as "boy" on one occasion, showing a discriminatory intent. The Court considers all the evidence provided by both Mr. Abdul-Baaqiy and Fannie Mae to determine whether a reasonable juror could infer intentional discrimination. *See Waterhouse*, 298 F.3d at 992-93; *see also Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (holding the court considers "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [any] other evidence").

### 1. Fannie Mae's Legitimate Non-Discriminatory Reason

Both parties submitted evidence of the feedback received by Mr. Abdul-Baaqiy during his 2009 and 2010 year-end evaluations from his supervisors and peers. *See* Mem. at 14-15; Opp'n at 13-14. The Court agrees that these records demonstrate that some peers stated that Mr. Abdul-Baaqiy "works well with other people in the team" and "follows through well on tasks assigned to him," while others stated that he "[n]eeds to improve quality of work" and "requires more support than he provides." 2010 Gathering Feedback for Associates of Saddiq Abdul-Baaqiy; *see also* 2009 Accountability Survey for Saddiq Abdul-Baaqiy at FM-AB000490-91 (stating Mr. Abdul-Baaqiy was "[a] competent and out-spoken team mate who readily offers suggestions for improvement" and that he "[a]lienated many coworkers early in the project"). Despite this positive and negative feedback, the undisputed facts show that Mr. Abdul-Baaqiy received the lowest rating on his year-end evaluations in both 2009 and 2010 and was ranked by his peers as below the 25th percentile. *See* Abdul-Baaqiy 2009 Year-End Eval. at FM_AB000504; Abdul-Baaqiy 2010 Year-End Eval. at FM_AB000789; 2009 Accountability Survey for Saddiq Abdul-Baaqiy at FM_AB000490-91; 2010 Gathering Feedback for Associates for Saddiq Abdul-Baaqiy; HR Communications Email. For each of Mr. Abdul-Baaqiy's evaluations his supervisors testified he received a low rating because of his performance, *see supra* at I.A, Undisputed Material Facts ¶¶ 9-10, 12-13, and Mr. Blundell stated that Mr. Abdul-Baaqiy's termination was the result of consecutive low evaluations and a lack of improvement year-to-year. *Id.* ¶ 15. Fannie Mae has advanced legitimate non-discriminatory reasons for its actions.

### 2. Mr. Abdul-Baaqiy's Claim of Pretext

Mr. Abdul-Baaqiy contends that Fannie Mae's justification for the ratings it gave him is a mere pretext for discrimination because he was in a new position or had a new

supervisor shortly before each evaluation. However, he provides no citations to the record or legal support to explain why such facts would support a finding that the actual reason for his low ratings was race discrimination. *See Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) ("Consistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly."). There is little space between Fannie Mae's and Mr. Abdul-Baaqiy's arguments about the reasons for his ratings. Fannie Mae argues that Mr. Abdul-Baaqiy received low ratings for two consecutive years because he was performing poorly as compared to his peers. Mr. Abdul-Baaqiy argues that he was rated poorly because his supervisors were required to put some employees in the lowest performance category. Those two arguments are not inconsistent. Neither would lead a reasonable juror to the inference that the underlying reason for Mr. Abdul-Baaqiy's low ratings and termination were his race. *See Aka*, 156 F.3d at 1288 n.3 (finding that pretext under *McDonnell Douglas* requires showing "both that the [employer's] explanation is incorrect *and* that the employer's real reason was discriminatory") (emphasis in original).

Additionally, Mr. Abdul-Baaqiy argues that the decision to terminate him was made prior to the 2010 year-end evaluation period and, therefore, his termination could not have been based on the poor rating on his 2010 evaluation. The record citation provided by Mr. Abdul-Baaqiy directly contradicts his argument. Mr. Abdul-Baaqiy cites Exhibit 6 of the deposition of the Director of Fannie Mae's Making Home Affordable program, Mr. Malcolm J. Blundell. Exhibit 6 is an email chain between Mr. Blundell and Ms. Cheryl Sember (a Human Resources employee at Fannie Mae). In the December 17, 2010 email, Mr. Blundell advises that Mr. Abdul-Baaqiy is under consideration to be "managed out" because he received a rating of 4

in both 2009 and 2010. *See* Blundell Dep. at Ex. 6 (FM_AB000565). While 2010 had not ended as of December 17, it is evident from Mr. Blundell's email that Mr. Abdul-Baaqiy's 2010 performance evaluation had already been completed and he continued to show poor performance. These arguments are insufficient to lead a reasonable juror to the inference that the underlying reason for Mr. Abdul-Baaqiy's termination was his race.

### 3. Mr. Abdul-Baaqiy's Direct Evidence of Discriminatory Intent

The direct evidence of racial discrimination advanced by Mr. Abdul-Baaqiy is that Mr. Gonsalves once called him "boy." The Court agrees that the use of the term "boy" to refer to an African-American man can evidence racial animus, *see Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006), and accepts the statement as undisputed for the purposes of Fannie Mae's motion.

However, assuming Mr. Abdul-Baaqiy's allegation about Mr. Gonsalves's statement as true, the Court finds that Mr. Abdul-Baaqiy has not met his burden of putting forth "some evidence establishing a reasonable inference that the defendant's proffered explanation [for his low performance ratings and termination] is unworthy of credence." *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 722 (D.C. Cir. 1991). As plaintiff, Mr. Abdul-Baaqiy has the burden to either "persuad[e] the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Mr. Abdul-Baaqiy has done neither. Instead he relies on a single alleged derogatory comment, which is insufficient to overcome Fannie Mae's legitimate non-discriminatory reason for Mr. Abdul-Baaqiy's poor evaluations and ultimate termination.

"The general rule is that stray remarks, *i.e.*, comments that are not tied to the alleged adverse employment action, might be probative of discrimination, but are not sufficient

as direct evidence of discrimination." *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009) (internal quotations omitted). Here, Mr. Gonsalves's remark was made in early 2010. Mr. Abdul-Baaqiy argues that Mr. Gonsalves's 2010 statement can lead a reasonable juror to believe that Mr. Abdul-Baaqiy's 2009 mid-year and year-end evaluations were a result of racial animus, not poor performance. The potential proximity of the remark to Mr. Abdul-Baaqiy's 2009 year-end evaluation is the only factor that leans toward a possible link between the statement and Mr. Abdul-Baaqiy's 2009 year-end rating. The sole remark alone is not sufficient for a reasonable jury to find discrimination and there is no other direct or circumstantial evidence of discrimination.[6] Mr. Abdul-Baaqiy does not attempt to connect Mr. Gonsalves's statement to his 2010 evaluation from Ms. Roy or the decision to terminate him made by Mr. Blundell. *See Hampton v. Vilsack*, 685 F.3d 1096, 1101 (D.C. Cir. 2012) (finding that racial animus by an employee not tied to the ultimate employment decision, with no evidence that the animus affected the decision, was insufficient to defeat a motion for summary judgment); *see also Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 654-55 (D.C. Cir. 2003); *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.").

Considering all the evidence, including Fannie Mae's legitimate non-discriminatory reasons and Mr. Abdul-Baaqiy's very limited evidence of pretext and discriminatory intent, the Court finds that no reasonable jury could conclude that Fannie Mae's

---

[6] As discussed above, Mr. Abdul-Baaqiy's purported statistical evidence of a disparate impact in the performance review system is unsupported and unreliable and cannot be used to further support his disparate-treatment claim.

actions were a result of disparate treatment and will grant summary judgment to Fannie Mae on

the claims of disparate treatment under the DCHRA and § 1981.[7]

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant Fannie Mae's Motion for

Summary Judgment, Dkt. 54.  A memorializing Order accompanies this Memorandum Opinion.


Date: September 27, 2018

_____
ROSEMARY M. COLLYER
United States District Judge

---

[7] Mr. Abdul-Baaqiy also attempts to bootstrap his disparate-treatment and disparate-impact claims, arguing that "[t]he record evidence clearly shows that Plaintiff was targeted for termination due to the forced-rating system and raises an inference that Defendant Fannie Mae's justifications of performance deficiencies were pretext for discrimination."  Opp'n at 3.  Mr. Abdul-Baaqiy's belief that he was only rated at the lowest level of performance because of the forced-rating system does not lead to the conclusion that he was the victim of that rating system because of his race.  Disparate treatment requires a showing of discriminatory intent and Mr. Abdul-Baaqiy has not made such a showing.  Mr. Abdul-Baaqiy points to the deposition testimony and declaration of Ms. Everson-Jones to show that other individuals at Fannie Mae believed the forced-ranking policy was having a disparate impact on minority employees.  These statements do not include any allegations concerning the individuals involved in the evaluation or termination decisions related to Mr. Abdul-Baaqiy.